14-1405, -1428

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

SEALANT SYSTEMS INTERNATIONAL, INC. and

ACCESSORIES MARKETING, INC.,

*Plaintiffs - Cross-Appellants*

v.

TEK GLOBAL, S.R.L. and TEK CORPORATION,

*Defendants - Appellants*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA IN 5:11-cv-774-PSG
(CONSOLIDATED WITH 5:11-cv-1649-PSG)
HON. PAUL S. GREWAL

---

**BRIEF OF PLAINTIFFS AND CROSS-APPELLANTS
SEALANT SYSTEMS INTERNATIONAL, INC.
AND ACCESSORIES MARKETING, INC.**

---

Dated: October 20, 2014

/s/ Stanley M. Gibson
Stanley M. Gibson (Bar No. 162329)
Gregory S. Cordrey (Bar No. 190144)
Andrew I. Shadoff (Bar No. 272319)
Jeffer Mangels Butler & Mitchell LLP
1900 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-4308
Telephone:   (310) 203-8080
Facsimile:   (310) 203-0567
*Attorneys for Plaintiffs - Cross-Appellants*

Form 9

FORM 9.  Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Sealant Systems International, Inc. and Accessories Marketing, Inc. v. TEK Global, S.r.l. and TEK Corporation

No. 14-1405

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
Sealant Systems International, Inc. and Accessories Marketing, Inc certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:
Sealant Systems International, Inc.; Accessories Marketing, Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:
Not applicable

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:
Illinois Tool Works, Inc.; Accessories Marketing Holding Company

4. ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:
Jeffer Mangels Butler & Mitchell LLP; Stanley M. Gibson, Gregory S. Cordrey, Andrew I. Shadoff

| May 2, 2014 | |
|---|---|
| Date | Signature of counsel |
| | Stanley M. Gibson |
| | Printed name of counsel |

Please Note: All questions must be answered
cc: _____

124

# TABLE OF CONTENTS

Page

STATEMENT OF RELATED CASES ................................................................. 1

STATEMENT OF JURISDICTION ................................................................. 1

STATEMENT OF THE ISSUES ................................................................. 1

STATEMENT OF THE CASE ................................................................. 2

STATEMENT OF FACTS ................................................................. 5

I.     AMI, TEK CORP., AND THE OEM TIRE REPAIR KIT MARKET .......... 5

       A.     AMI Sells SSI All of the Tire Repair Kits That SSI Sells to OEMs ................................................................. 5

       B.     TEK Corp. Occupies a Major Position in the U.S. OEM Market ....... 6

       C.     AMI (Through SSI) Directly Competes With TEK Corp. in the OEM Market ................................................................. 6

       D.     AMI's Product Designs Around the '581 Patent With an Expensive Cap Design ................................................................. 7

       E.     TEK Corp. Has Gained Market Share at AMI's Expense By Infringing the '581 Patent ................................................................. 8

       F.     TEK's Infringement Unfairly Allows It to Continue Obtaining "Design Wins" ................................................................. 8

II.    THE '581 PATENT PROVIDES IMPORTANT ADVANCES OVER PRIOR ART ................................................................. 9

III.   THE DISTRICT COURT'S INJUNCTION ................................................ 10

IV.    THE INVALIDITY OF THE TEK GLOBAL '110 PATENT .................... 12

SUMMARY OF THE ARGUMENT ................................................................. 14

ARGUMENT ................................................................. 16

I.     THE STANDARD OF REVIEW ON APPEAL ....................................... 16

# TABLE OF CONTENTS
## [CONTINUED]

Page

II. SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S VERDICT OF INFRINGEMENT AND VALIDITY OF THE '581 PATENT ........... 17

    A. Claims 27-31, 34 and 40 are Not Anticipated................................... 17

    B. Claim 42 is Valid and Infringed....................................................... 21

III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY ENJOINING TEK CORP.'S INFRINGING TIRE REPAIR KITS SOLD IN COMPETITION WITH AMI .................................................... 23

    A. AMI Has Suffered and, in the Absence of an Injunction, Would Continue to Suffer, Irreparable Harm............................................... 23

        1. AMI, Through SSI, and TEK Corp. are Direct Competitors .......................................................................... 24

        2. TEK Corp. Has Taken Market Share from AMI/SSI.............. 26

        3. The Parties' Competition for Design Wins Supports the Conclusion of Irreparable Harm.............................................. 26

        4. A Causal Nexus Exists Between AMI's Irreparable Injury and TEK Corp.'s Infringement ..................................... 27

    B. Money Damages are Inadequate ...................................................... 29

    C. The Balance of Hardships Strongly Favors an Injunction ............... 31

    D. The Scope of the Injunction Protects the Public Interest ................. 33

IV. SUBSTANTIAL EVIDENCE SUPPORTS THE DAMAGES AWARD................................................................................................. 34

    A. The Damages Award was Based on Substantial Evidence ............... 34

        1. Mr. Hansen Determined a Reasonable Royalty Rate By Analyzing a Hypothetical Negotiation ................................... 35

            a. Mr. Hansen's Methodology ......................................... 35

**TABLE OF CONTENTS**
**[CONTINUED]**

Page

b.   Factor One Supports the Royalty Rate Because There Had Been No Previous Licensing of the '581 Patent ................................................................. 35

c.   Factor Two Supports the Royalty Rate Because TEK Corp. Pays a 2% Royalty to a Related Entity to License Only a Patent Application ........................... 38

d.   Factor Five Supports the Royalty Rate Because TEK Corp. and AMI, Through SSI, are Direct Competitors ................................................................. 39

e.   Factor Eight Supports the Royalty Rate Because TEK Corp.'s Infringing Tire Repair Kits are Profitable ..................................................................... 41

f.   Factors Nine and Ten Support the Royalty Rate Because the Invention of the '581 Patent is Important to TEK Corp. ................................................ 41

g.   Factor Eleven Supports the Royalty Rate Because TEK Corp. Has Profited from Infringing the '581 Patent ........................................................................ 42

2.   Based on the Hypothetical Negotiation, Mr. Hansen Concluded That AMI Is Entitled to a 6 to 8% Reasonable Royalty Rate ........................................................ 43

3.   The Interests of IDQ and AMI Were Properly Considered at the Hypothetical Negotiation ............................................. 43

B.   TEK Corp. Failed to Meet Its Burden to Establish That Marking was Required ................................................................. 47

V.   THE COURT'S DETERMINATION THAT THE '110 PATENT IS INVALID SHOULD BE AFFIRMED ...................................................... 51

A.   The District Court Properly Construed the Phrase "Additional Hose (83) Cooperating With Said Inflatable Article" ....................... 52

# TABLE OF CONTENTS
## [CONTINUED]

Page

B.    The District Court Correctly Determined That Eriksen and Bridgestone Disclosed All of the Claimed Features ......................... 57

C.    The District Court Correctly Determined That It Would Have Been Obvious to a Person of Ordinary Skill in the Art to Combine Eriksen and Bridgestone .................................................... 59

D.    The District Court Determined That Evidence of Secondary Considerations of Nonobviousness, if Any Existed, Did Not Overcome the Strong Showing of Obviousness. .............................. 63

VI.    THE TRIAL COURT'S DENIAL OF PLAINTIFFS' EXCEPTIONAL CASE MOTION SHOULD BE VACATED AND REMANDED .......................................................................................... 65

CONCLUSION ................................................................................. 72

# TABLE OF AUTHORITIES

Page(s)

CASES

*ActiveVideo Networks, Inc. v. Verizon Comms., Inc.,*
  694 F.3d 1312 (Fed. Cir. 2012) ........................................................30

*Acumed LLC v. Stryker Corp.,*
  551 F.3d 1323 (Fed. Cir. 2008) ...............................................23, 32

*Ajinomoto Co. v. Archer-Daniels-Midland Co.,*
  228 F.3d 1338 (Fed. Cir. 2000) .........................................................3

*Alexsam, Inc. v. IDT Corp.,*
  715 F.3d 1336 (Fed. Cir. 2013) ........................................................17

*Apple, Inc. v. Samsung Elecs. Co.,*
  678 F.3d 1314 (Fed. Cir. 2012) ........................................................32

*Apple Inc. v. Samsung Elecs. Co.,*
  735 F.3d 1352 (Fed. Cir. 2013) ..........................................26, 28, 34

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.,*
  672 F.3d 1335 (Fed. Cir. 2012) ...............................................52, 53

*Asyst Techs., Inc. v. Emtrak, Inc.,*
  544 F.3d 1310 (Fed. Cir. 2008) ........................................................63

*B-K Lighting, Inc. v. Fresno Valves & Castings, Inc.,*
  375 F. App'x 28 (Fed. Cir. 2010) .....................................................59

*Baugh v. Cuprum S.A. de C.V.,*
  730 F.3d 701 (7th Cir. 2013) ............................................................49

*Broadcom Corp. v. Emulex Corp.,*
  732 F.3d 1325 (Fed. Cir. 2013) ...............................................passim

*Broadcom Corp. v. Qualcomm, Inc.,*
  543 F.3d 683 (Fed. Cir. 2008) ........................................................25

*Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.,*
  393 F.3d 1378 (Fed. Cir. 2005) ...............................................65, 66

# TABLE OF AUTHORITIES
## [CONTINUED]

Page(s)

*Caplan v. Fellheimer Eichen Braverman & Kaskey,*
68 F.3d 828 (3d Cir. 1995)..............................................................30

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,*
576 F.3d 1348 (Fed. Cir. 2009)......................................................47

*Checkpoint Systems, Inc. v. All-Tag Security Americas, Inc.,*
--- Fed. App'x ----, 2014 WL 4358440
(Fed. Cir. Sept. 4, 2014)............................................... 15, 66, 69, 71

*ClearValue, Inc. v. Pearl River Polymers, Inc.,*
668 F.3d 1340 (Fed. Cir. 2012)......................................................15

*Door-Master Corp. v. Yorktowne, Inc.,*
256 F.3d 1308 (Fed. Cir. 2001)......................................................16

*Douglas Dynamics, LLC v. Buyers Prods. Co.,*
717 F.3d 1336 (Fed. Cir. 2013)......................................................31

*DSW v. Shoe Pavilion,*
537 F.3d 1342 (Fed. Cir. 2008)......................................................55

*eBay Inc. v. MercExchange LLC,*
547 U.S. 388 (2006)...............................................................passim

*Ecolab, Inc. v. FMC Corp.,*
569 F.3d 1335 (Fed. Cir. 2009)......................................................24

*Eltech Systems Corp. v. PPG Indus., Inc.,*
903 F.2d 805 (Fed. Cir. 1990)........................................................71

*Enovsys LLC v. Nextel Comms., Inc.,*
614 F.3d 1333 (Fed. Cir. 2010)........................................... 16, 21, 22

*Ferguson Beauregard/Logic Controls v. Mega Sys., LLC,*
350 F.3d 1327 (Fed. Cir. 2003)......................................................40

*Finjan, Inc. v. Secure Computing Corp.,*
626 F.3d 1197 (Fed. Cir. 2010)................................................31, 36

# TABLE OF AUTHORITIES
## [CONTINUED]

Page(s)

*Fromson v. Western Litho Plate & Supply Co.,*
  853 F.2d 1568 (Fed. Cir. 1988) .....................................................................45

*Funai Elec. Co. v. Daewoo Electronics Corp.,*
  616 F.3d 1357 (Fed. Cir. 2010).....................................................................48

*Gaia Technologies, Inc. v. Reconversion Technologies, Inc.,*
  93 F.3d 774 (Fed. Cir. 1996)..........................................................................4

*Gillette Co. v. Energizer Holdings Inc.,*
  405 F.3d 1367 (Fed. Cir. 2005)....................................................................55

*Grain Processing Corp. v. Am. Maize-Prods. Co.,*
  185 F.3d 1341 (Fed. Cir. 1999)....................................................................31

*Hochstein v. Microsoft Corp.,*
  2009 U.S. Dist. LEXIS 128544 (E.D. Mich. May 16, 2009) ...........................56

*i4i Ltd. P'ship v. Microsoft Corp.,*
  589 F.3d 1246 (Fed. Cir. 2009)..............................................................23, 25

*In re Huang,*
  100 F.3d 135 (Fed. Cir. 1996)................................................................63, 64

*Innogenetics, N.V. v. Abbott Labs.,*
  512 F.3d 1363 .........................................................................................32, 42

*Integra Lifesciences I, Ltd. v. Merck KGaA,*
  331 F.3d 860 (Fed. Cir. 2003).......................................................................37

*Internet Machines LLC v. Alienware Corp.,*
  2013 WL 4056282 (E.D. Tex. June 19, 2013)...............................................38

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.,*
  688 F.3d 1342 (Fed. Cir. 2012)........................................................ 18, 19, 37

*Knoll Pharm. Co., Inc. v. Teva Pharms. USA, Inc*
  367 F.3d 1381 (Fed. Cir. 2004).....................................................................65

# TABLE OF AUTHORITIES
## [CONTINUED]

Page(s)

Knorr-Bremse Systeme Fuer Nutzfahrzeuge
  GmbH v. Dana Corp.,
  383 F.3d 1337 (Fed. Cir. 2004)................................................................45, 46

KSR Int'l Co. v. Teleflex Inc.,
  550 U.S. 398 (2007).........................................................................51, 61, 63

Laserdynamics, Inc. v. Quanta Computer, Inc.,
  694 F.3d 51 (Fed. Cir. 2012)..........................................................................37

Leapfrog Enters. v. Fisher-Price, Inc.,
  485 F.3d 1157 (Fed. Cir. 2007).......................................................................64

Lucent Techs., Inc. v. Gateway, Inc.,
  580 F.3d 1301 (Fed. Cir. 2009).......................................................................39

Mas-Hamilton Group v. LaGard, Inc.,
  156 F.3d 1206 (Fed. Cir. 1998).......................................................................50

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
  475 U.S. 574 (1986).......................................................................................65

Micro Chem., Inc. v. Lextron, Inc.,
  317 F.3d 1387 (Fed. Cir. 2003).......................................................................35

Minco, Inc. v. Combustion Eng'g, Inc.,
  95 F.3d 1109 (Fed. Cir. 1996)...................................................................35, 40

Octane Fitness, LLC v. ICON Health & Fitness, Inc.,
  572 U.S. ___, 134 S. Ct. 1744 (2014) .....................................................passim

Opryland USA Inc. v. Great Am. Music Show, Inc.,
  970 F.2d 847 (Fed. Cir. 1992).........................................................................64

Oracle Am., Inc. v. Google, Inc.,
  2011 WL 5576228 (N.D. Cal. Nov. 15, 2011) ....................................47, 48, 49

Oracle Am., Inc. v. Google Inc.,
  798 F.Supp.2d 1111 (N.D. Cal. 2011)..............................................................45

# TABLE OF AUTHORITIES
## [CONTINUED]

Page(s)

*Paradise Creations, Inc. v. UV Sales, Inc.,*
    315 F.3d 1304 (Fed. Cir. 2003).............................................................................3

*Parallel Networks, LLC v. Abercrombie & Fitch Co.,*
    704 F.3d 958 (Fed. Cir. 2013)............................................................................62

*Polaroid Corp. v. Eastman Kodak Co.,*
    1990 WL 324105 (D. Mass. Oct. 12, 1990) .....................................................28

*Poly-Am., L.P. v. GSE Lining Tech., Inc.,*
    383 F.3d 1303 (Fed. Cir. 2004)..........................................................................28

*Powell v. The Home Depot U.S.A., Inc.,*
    663 F.3d 1221 (Fed. Cir. 2011)..........................................................................34

*PPG Indus., Inc. v. Guardian Indus. Corp.,*
    75 F.3d 1558 (Fed. Cir. 1996)............................................................................33

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.,*
    702 F.3d 1351 (Fed. Cir. 2012)...........................................................25, 28, 30

*Propat Int'l Corp. v. RPost, Inc.,*
    473 F.3d 1187 (Fed. Cir. 2007)............................................................................3

*Qualcomm Inc. v. Broadcom Corp.,*
    548 F.3d 1004 (Fed. Cir. 2008)..........................................................................71

*ResQNet.com, Inc. v. Lansa, Inc.,*
    594 F.3d 860 (Fed. Cir. 2010)............................................................................38

*Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.,*
    563 F.3d 1358 (Fed. Cir. 2009)....................................................................16, 22

*Robert Bosch LLC v. Pylon Manuf. Corp.,*
    659 F.3d 1142 (Fed. Cir. 2011).................................................... 24, 25, 28, 31

*Scott v. Ross,*
    140 F.3d 1275 (9th Cir. 1998)............................................................................39

*Shiley, Inc. v. Bentley Labs., Inc.,*
    794 F.2d 1561 (Fed. Cir. 1986)..........................................................................49

## TABLE OF AUTHORITIES
### [CONTINUED]

Page(s)

*Sinclair Ref. Co. v. Jenkins Petroleum Process Co.,*
289 U.S. 689 (1933)..........................................................................................45

*Spectralytics, Inc. v. Cordis Corp.,*
649 F.3d 1336 (Fed. Cir. 2011)......................................................................36

*Streck, Inc. v. Research Diagnostic Sys., Inc.,*
665 F.3d 1269 (Fed. Cir. 2012).......................................................................16

*Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.,*
862 F.2d 1564 (Fed. Cir. 1988).......................................................................46

*Texas Digital Systems, Inc. v. Telegenix, Inc.,*
308 F.3d 1193 (Fed. Cir. 2002).................................................................48, 49

*Titan Tire Corp. v. Case New Holland, Inc.,*
566 F.3d 1372 (Fed. Cir. 2009).......................................................................23

*Tokai Corp. v. Easton Enters., Inc.,*
632 F.3d 1358 (Fed. Cir. 2011).......................................................................60

*Trebro Manuf., Inc. v. Firefly Equip., LLC,*
748 F.3d 1159 (Fed. Cir. 2014).......................................................................30

*Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co.,*
425 F.3d 1366 (Fed. Cir. 2005) ......................................................................47

*Verizon Servs. Corp. v. Vonage Holdings Corp.,*
503 F.3d 1295 (Fed. Cir. 2007).......................................................................24

*Wang Labs., Inc. v. Toshiba Corp.,*
993 F.2d 858 (Fed. Cir. 1993).........................................................................46

*Weather Eng'g Corp. of Am. v. United States*
614 F.2d 281 (Ct. Cl. 1980) ............................................................................65

*Wechsler v. Macke Int'l Trade, Inc.,*
486 F.3d 1286 (Fed. Cir. 2007).......................................................................29

*Whitserve, LLC v. Computer Packages, Inc.,*
694 F.3d 10 (Fed. Cir. 2012)...........................................................................43

## TABLE OF AUTHORITIES
### [CONTINUED]

Page(s)

*Windsurfing Int'l, Inc. v. AMF, Inc.,*
   782 F.2d 995 (Fed. Cir. 1986) .......................................................................31

*Zenith Electronics Corp. v. PDI Comm. Sys., Inc.,*
   522 F.3d 1348 (Fed. Cir. 2008) ......................................................................17

**STATUTES**

28 U.S.C.
   § 1292(a)(1) ......................................................................................................1
   § 1292 (c)(1).....................................................................................................1
   § 1331................................................................................................................1
   § 1338(a)...........................................................................................................1

35 U.S.C.
   § 102(b) ...........................................................................................................50

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 26(e)..................................................................69

Federal Rule of Evidence 402 ..............................................................................49

Federal Rule of Evidence 403 ..............................................................................49

## STATEMENT OF RELATED CASES

There have been no previous appeals in this action.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).  The district court granted Plaintiff Accessories Marketing, Inc.'s ("AMI") request for a permanent injunction against Defendant TEK Corporation ("TEK Corp.") on March 10, 2014.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1292(a)(1) and (c)(1).

## STATEMENT OF THE ISSUES

1)    Whether the jury's verdict of validity of AMI's U.S. Patent No. 6,789,581 ("the '581 patent") is supported by substantial evidence that there was no clear and convincing evidence of anticipation?

2)    Whether the district court appropriately exercised its discretion by enjoining TEK Corp.'s infringing tire repair kit—for which AMI offers a competing alternative—and by implementing a "Sunset Period" to allow automotive Original Equipment Manufacturers ("OEMs") time to transition?

3)    Whether the jury's verdict of damages is supported by substantial evidence?

4)     Whether the district court appropriately construed the term "cooperating with" as broader than "directly connected to" and found Defendant TEK Global, S.r.l.'s ("TEK Global") U.S. Patent No. 7,789,110 ("the '110 patent") invalid as a result?

5)     Whether the district court's finding that the case is not exceptional should be remanded in light of *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. ___, 134 S. Ct. 1744 (2014) ("*Octane Fitness*"), where TEK Global fabricated a translation in an attempt to avoid prior art to the '110 patent and TEK Corp. litigated a meritless infringement defense to the '581 patent?

## STATEMENT OF THE CASE

The jury found that TEK Corp.'s TEK400 and TEK500 tire repair kits infringe AMI's '581 patent.  This patent teaches a two-piece port-and-receptacle system that allows the user to remove and discard the sealant container and port (with the hose connected), without having to throw out the entire kit, which can still function as an air compressor.  A user can then replace the container and port (with hose), and the kit can be reused as a tire repair kit.  This two-piece system is a significant advance over the prior art.

AMI and its sister company, Sealant Systems International, Inc. ("SSI"), are California corporations engaged in the manufacture and sale of onboard tire repair

kits. TEK Corp. is a Michigan corporation that sells tire repair kits to OEMs. TEK

Automotive Shanghai manufactures the tire repair kits for TEK Corp. in China.

TEK Global is an Italian company and is the parent of TEK Corp. and TEK

Automotive Shanghai (collectively, "TEK").

On November 10, 2010, TEK Global sued SSI for infringement of the '110

patent in the Southern District of New York. On February 18, 2011, SSI filed an

action for declaratory judgment of non-infringement and invalidity of the '110

patent in the Northern District of California. *See* A173-236. SSI successfully

moved to transfer the New York case to California and the two cases were

consolidated. A237-40.

On April 27, 2011, AMI purchased the '581 patent. In June 2011, the

complaint was amended to add AMI as a plaintiff and to first assert infringement

of the '581 patent (the "First Amended Complaint").[1] A246-88. When AMI

---

[1] TEK Corp.'s argument that AMI lacked standing is wrong. AMI acquired the
'581 patent in April 2011 and first sued for infringement in June 2011. "It is well
established that the holder of all substantial patent rights, by assignment or by
exclusive license, has standing to sue for infringement in its own
name." *Ajinomoto Co. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338, 1343 (Fed.
Cir. 2000). Thus, AMI's purchase of the '581 patent entitled it to later sue TEK
Corp. TEK Corp.'s cited cases are inapposite. *Propat Int'l Corp. v. RPost, Inc.*,
473 F.3d 1187 (Fed. Cir. 2007) dealt with whether the plaintiff was a licensee with
sufficient rights in the patent to sue in its own name, not whether the plaintiff
owned the patent before filing suit. In *Paradise Creations, Inc. v. UV Sales, Inc.*,
315 F.3d 1304 (Fed. Cir. 2003), the issue was whether a suit must be dismissed for
lack of standing because the plaintiff corporation claimed its patent rights under a

purchased the '581 patent it acquired, among other things, "the sole right to institute, prosecute and control actions … against third parties … including actions for both past infringement and future infringement…." A5380-81. In October 2011, TEK Global stipulated to AMI's request to amend the complaint to add TEK Corp. as a defendant on the infringement claim. A6467-69.[2]

On summary judgment, the district court determined that clear and convincing evidence established that the asserted claims of the '110 patent were invalid as obvious. The district court found that no reasonable jury could find other than that the Bridgestone reference (which was not before the patent examiner) disclosed the two key limitations, a "three-way valve" and "an additional hose," that the patent examiner had found were not disclosed in the prior art.

---

contract executed, and filed its lawsuit, at a time when it was administratively dissolved. And in *Gaia Technologies, Inc. v. Reconversion Technologies, Inc.*, 93 F.3d 774 (Fed. Cir. 1996), the plaintiff lacked ownership of the patent when it first asserted infringement. That is not the case here.

[2] TEK Corp. apparently argues that *AMI* has no standing because a declaratory judgment complaint (not involving the '581 patent) had been filed earlier by *SSI* (not AMI). But that makes no sense. AMI owned the '581 patent when it was first asserted in this litigation and therefore could have brought a separate patent infringement lawsuit at that time but TEK Global and TEK Corp. stipulated to have the patent infringement claim added to the declaratory judgment complaint, so that there would be only one lawsuit and not two. *See* A6467-69.

Thereafter the case proceeded to trial on AMI's '581 patent.  After the court empanelled a nine-person jury, the jury found claims 27-31, 34, 40 and 42 of the '581 patent valid and infringed.  The jury applied a 7% royalty rate to a base of $17,956,000 and awarded damages of $1,256,920.

On the parties' post-trial cross motions, the court denied TEK Corp.'s motions for judgment as a matter of law and granted, among others, AMI's motion for a permanent injunction, which included a sunset period.

## STATEMENT OF FACTS

### I.     AMI, TEK CORP., AND THE OEM TIRE REPAIR KIT MARKET

#### A.     AMI Sells SSI All of the Tire Repair Kits That SSI Sells to OEMs

AMI is the "manufacturing arm" of tire repair kits for its sister company, SSI.  A3351-52 (79:24-80:7).  SSI was incorporated to be the OEM sales arm for AMI, while AMI sells to consumers.  A3350 (78:7-24).  AMI and SSI are both owned by Accessories Marketing Holding Corporation, which in turn is owned by Illinois Tool Works, Inc. ("ITW").  A3341-42 (69:19-70:2).  AMI and SSI share the same employees, facilities and resources.  A3339-41 (67:17-69:5); *see also* A3623 (351:20-21), A3624 (352:10-11).

AMI sells tire repair kits to SSI through an inter-company sale, and SSI sells those kits to OEMs.  A3351-52 (79:24-80:7).  As a result, their sales are directly

connected:  AMI's sales to SSI increase when SSI's sales to OEMs increase.  A3352 (80:8-12).

### B.    TEK Corp. Occupies a Major Position in the U.S. OEM Market

TEK Corp. also sells tire repair kits in the United States to OEMs.  A3394 (122:19-21).  TEK Corp. occupies a primary position in the tire repair kit market in the United States and is the sole supplier to several OEMs, including Ford and Chrysler.  A3926 (654:13-20).  TEK Corp.'s president estimated that "more than a hundred car models are equipped" with TEK Corp.'s tire repair kits in the United States.  A3924 (652:3-5).  TEK Corp. also receives an estimated 50-60% of the tire repair kit business at General Motors.  *See* A3404-05 (132:22-133:4); A3710-11 (438:20-439:7).

### C.    AMI (Through SSI) Directly Competes With TEK Corp. in the OEM Market

There is no dispute that SSI directly competes with TEK Corp.  TEK Corp.'s 30(b)(6) witness Andrzej Matuszynski testified, through his videotaped deposition, that TEK Corp. competed with SSI in the OEM market as both companies offered similar tire repair kits that use sealant to seal a puncture and use a compressor to inflate a tire.  A4993-94 (48:17-49:10); A3413.

Chris Auerbach, then the General Manager of AMI and SSI, agreed that TEK Corp. and SSI compete head-to-head. A3393-94 (121:13-122:9). Indeed, SSI has lost significant business to TEK Corp; Mr. Auerbach testified that SSI had lost business to TEK Corp. on various car platforms. A3394-95 (122:22-123:5); *see also* A3704 (432:20-23).

When SSI sells fewer kits to OEMs, AMI sells fewer kits to SSI. *See* A3352 (80:8-12). Thus, even though AMI does not practice the '581 patent, its tire repair kits are in direct competition with TEK Corp.'s tire repair kits. *See* A3639 (367:19-21).

### D.    AMI's Product Designs Around the '581 Patent With an Expensive Cap Design

AMI's automatic tire repair kit that SSI sells to OEMs does not practice the '581 patent. *See* A3639 (367:19-21). To avoid infringing the '581 patent (before it purchased the patent), AMI designed an "expensive" and "elaborate" cap in its automatic kit. *See* A3632-34 (360:6-362:2). The cap costs AMI $3.10 to manufacture, which is significant because the total cost of the tire repair kits is between $28 and $32. A3632 (360:6-16).[3]

---

[3] Contrary to TEK Corp.'s contention that AMI purchased the '581 patent to file suit, AMI's then Global Director of Manufacturing, Brett Mueller, explained that

### E.     TEK Corp. Has Gained Market Share at AMI's Expense By Infringing the '581 Patent

TEK Corp.'s infringing products do not have the expensive cap, which allows TEK Corp. to undercut the prices of AMI's kits. *See* A4640-43 (TEK Corp.'s kits cost between $25.93 and $26.25); A3632 (360:6-16) (AMI's kits cost between $28 and $32); A6472, ¶ 5.

### F.     TEK's Infringement Unfairly Allows It to Continue Obtaining "Design Wins"

In the OEM market, an agreement with a particular OEM to supply a particular tire repair kit on a particular platform of vehicles is known as a "design win." A6471, ¶ 2. Design wins are not simply sale-by-sale decisions; rather, they represent the culmination of a process that includes multiple stages and carries with it ramifications that can last for years. *Id.*; A3702-03 (430:14-431:3). An OEM typically begins the design win process by issuing requests for quote ("RFQs") to select suppliers, who respond with an evaluation of their product in relation to the OEM's requirements. A6471, ¶ 2. In some circumstances, the RFQ process is followed by or includes a qualification process in which the supplier and

---

AMI purchased the patent in part to avoid these costs in future tire repair kits. *See* A3632 (360:2-16).

OEM's engineers work together to evaluate whether the supplier's proposed solution will function to the OEM's satisfaction.  *Id.*; A3702-03 (430:14-431:10).

Design wins in the tire repair kit market create familiarity and confidence that yields an incumbency effect, which can carry over from one design cycle to the next.  A6471, ¶ 3; A3703 (431:4-11).  The design win process involves a significant investment of money, time, and effort on the part of both the supplier and the OEM.  A6471, ¶ 3; A3702-03 (430:14-431:3).  Further, OEMs and suppliers generally do not redesign their products from the ground up from one vehicle platform to the next.  A6471, ¶ 3; A3703 (431:4-11).  This increases the likelihood that the supplier and OEM will continue to harvest their initial investment through future contracts.  *See id.*  Furthermore, in the tire repair kit market, OEMs tend to look to its current suppliers for future designs, rather than to suppliers to which the OEMs have not already awarded business.  *Id.*

## II.    THE '581 PATENT PROVIDES IMPORTANT ADVANCES OVER PRIOR ART

The '581 patent, as well as TEK Corp.'s infringing kit, teaches the use of a two-piece port and receptacle system that allows the user to remove and discard the sealant container and port (with the hose) without having to throw out the entire repair kit, which can still be used as an air compressor.  Claim 27 is illustrative:

27. A tire repair device, comprising:

a housing;

an air compressor disposed within said housing;

an air flow path from said air compressor adapted to be connected to a tire;

a receptacle formed in said housing in communication with said air flow path; and

a port disposed in said receptacle in communication with said air flow path adapted to sealingly receive a bottle of tire sealant,

wherein when said air compressor is activated and a bottle of tire sealant is received in said receptacle, air from said air compressor is forced into the bottle and pushes tire sealant out of the bottle, into said receptacle, into said air flow path, and into the tire.

A171 (col. 9, l. 57–col. 10, l. 5).

Because of this teaching, the user can replace the container and port (with the hose), and the kit can be reused as a tire repair kit. A4260-61 (988:24-989:5). As TEK's expert, Dr. Homayoon Kazerooni, admitted at trial, this two-piece port and receptacle system was not contained in any prior art. *See* A4254-59 (982:20-987:3).

## III.    **THE DISTRICT COURT'S INJUNCTION**

The district court entered a permanent injunction on March 10, 2014. In considering AMI's request for injunctive relief, the district court applied the four-

part test for injunctive relief set forth in *eBay Inc. v. MercExchange LLC*, 547 U.S. 388, 391 (2006):

- On the basis of unchallenged evidence that TEK Corp. achieved design wins and corresponding market share gains at AMI's direct expense, the district court concluded that AMI suffered irreparable harm and is likely to continue to do so in the absence of an injunction.  *See* A68-75.

- On the basis of unchallenged evidence that design wins yield unquantifiable secondary benefits, the district court concluded that money damages would be inadequate to compensate AMI for TEK Corp.'s infringement.  *See* A75-76.

- On the basis of, among other things, unchallenged evidence that AMI and TEK Corp. compete in the same market and that AMI has lost sales to TEK Corp., the district court concluded that the balance of hardships as between AMI and TEK Corp. favors an injunction.  *See* A76-77.

- The district court concluded that a "Sunset Period" was an appropriate safeguard against potential adverse consequences of an injunction.  *See* A77-78.

## IV.  THE INVALIDITY OF THE TEK GLOBAL '110 PATENT

The '110 patent discloses a tire repair kit comprising an air compressor, a container of sealant, a casing housing the air compressor and sealant container, and hoses and fittings.  A148 (col. 2, lines 44-51). The '110 patent itself concedes that the prior art disclosed these components, but required some assembly or replacement before use.  A148 (col. 1, lines 12-67); A1814-15.  The '110 patent sought to overcome these problems.  A148 (col. 2, lines 3-6).  While the '110 patent discloses several problems with prior art tire repair kits, none involved clogging of sealant in the hoses.  *Id*. (cols. 1 and 2).

The original claims in the '110 patent were initially rejected because they were all determined to be anticipated and obvious based largely upon U.S. Patent Publication 2003/0056851 ("Eriksen").  A1968-1981, ¶¶ 10-14; A1816-18; A1853-75.  The examiner determined that the claims would be allowable if they included "*an additional hose cooperating with said inflatable article and a three-way valve*…," which he believed were not disclosed in the prior art.  A1979 , ¶ 18.  In response, the applicant amended the claims to include these two features.  A1983-93; A1818-19.  The examiner allowed the claims based on his mistaken understanding that these features were not disclosed in the prior art.  *Id*.

On May 14, 2003, almost two years before the filing of the PCT application upon which the '110 patent is based, Bridgestone Corporation filed a Japanese

12

patent application, No. 2003-135551, for a tire repair device. A1877-1911. Like Eriksen, Bridgestone was directed to the same problem of providing compressed air or sealant to a tire for inflation or repair. A1867; A1893. Also like Eriksen, Bridgestone's tire repair device included a compressor, a container of sealant, a casing housing the compressor and sealant, and hoses and fittings. A1867, ¶ 2; A1893; A1907-08, Fig. 1; A1821-22; A2223-29. But unlike Eriksen, Bridgestone disclosed using a three-way valve and an additional hose to selectively provide air or sealant to a tire. A1896-97, ¶¶ 12-15; A2220, ¶¶ 8-10. Bridgestone was not before the examiner.

Bridgestone discloses a first air tube 54 that is connected to a three-way valve 48. A1897; A1908, Fig. 1. The first air tube, like the claimed additional hose, is used to provide air only to the tire. A1897, ¶ 14 ("valve [48] closes the main liquid tube and opens the first air tube [54] to supply compressed air from the air supply means through the first air tube and joint member [66] to the pneumatic tire…"); *compare with* A150 (col. 5, lines 29-31) ("Additional hose 83 … enables compressor assembly 2 to be used quickly and easily to inflate a flat tyre.").

The district court construed the term "cooperating with" in the phrase "an additional hose cooperating with said inflatable article" to mean "working together" and rejected TEK Global's "directly connected to" construction as unsupported. A8-9. TEK Global's appeal centers on this legal conclusion. The

district court's construction is supported by the claim language, the specification, and the extrinsic evidence.

## SUMMARY OF THE ARGUMENT

TEK Corp.'s appeal raises three issues. None have merit.

First, there is substantial evidence to support the jury's verdict that TEK Corp. did not prove anticipation of claims 27-31, 34, 40 and 42 of the '581 patent by clear and convincing evidence, and TEK Corp. does not challenge these claims based on obviousness on appeal. The sole piece of prior art cited by TEK Corp. does not contain a receptacle formed in the housing in communication with the air flow path or a port that is disposed in the receptacle, much less the reservoir cited in claim 42. In addition, on appeal, TEK Corp. only challenges infringement of claim 42 and there is substantial evidence of infringement as AMI's expert explained without contradiction that sealant collects in the reservoir of the TEK Corp. tire kit outside of the sealant container.

Second, TEK Corp.'s challenges to the district court's exercise of discretion in crafting a permanent injunction are baseless. The technology of the '581 patent is fundamental to TEK Corp.'s infringing products (the products would not work without it), and TEK Corp. has relied on that technology to achieve market success at the expense of AMI—a direct competitor. The district court carefully and

consistently applied the *eBay* standards and arrived at an injunction with a precisely crafted Sunset Period that protected the OEMs.

Third, there is substantial evidence to support the jury's verdict on damages. AMI presented a thorough damage analysis that went through each of the *Georgia-Pacific* factors, while TEK Corp.'s expert presented no analysis and did not render an opinion on damages.

TEK Global's single issue on appeal challenges the district court's finding of invalidity of the '110 patent, arguing that the district court erred in claim construction. This argument also has no merit. The district court properly construed the term "cooperating with" to be broader than "directly connected to" based on the claim language, the specification, and the relevant extrinsic evidence.

Finally, this Court should remand the exceptional case issue as the district court used the old standard that the Supreme Court has since overturned. *See Checkpoint Systems, Inc. v. All-Tag Security Americas, Inc.*, --- Fed. App'x ----, 2014 WL 4358440, *1-2 (Fed. Cir. Sept. 4, 2014) (vacating district court's earlier ruling on exceptional case motion and remanding in light of *Octane Fitness*).

**ARGUMENT**

I.    **THE STANDARD OF REVIEW ON APPEAL**

This Court "review[s] the grant or denial of a motion for JMOL under the law of the regional circuit." *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 668 F.3d 1340, 1343 (Fed. Cir. 2012).  Under Ninth Circuit law, this Court applies the same standard as the district court, which requires that "a jury verdict '***must be upheld*** if it is supported by substantial evidence … even if it is also possible to draw a contrary conclusion.'" *Enovsys LLC v. Nextel Comms., Inc.*, 614 F.3d 1333, 1341 (Fed. Cir. 2010) (emphasis added; citation omitted).

"A court will not weigh the evidence or assess the credibility of witnesses in determining whether substantial evidence exists."  *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1371 (Fed. Cir. 2009).  Thus, "[w]here, as here, a jury finds a patent valid," the Federal Circuit "will not disturb that finding unless reasonable jurors could not have reached that verdict." *Door-Master Corp. v. Yorktowne, Inc.*, 256 F.3d 1308, 1312 (Fed. Cir. 2001).

This Court "review[s] the district court's decision entering an injunction, as well as the scope of the injunction, for abuse of discretion." *Streck, Inc. v. Research Diagnostic Sys., Inc.*, 665 F.3d 1269, 1293 (Fed. Cir. 2012).  TEK Corp. must prove that the district court acted "based upon an error of law or clearly erroneous factual findings or commit[ted] a clear error of judgment in weighing

relevant factors." *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1336 (Fed. Cir. 2013) ("*Emulex*") (citation and internal quotation marks omitted).

## II.    SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S VERDICT OF INFRINGEMENT AND VALIDITY OF THE '581 PATENT

### A.    Claims 27-31, 34 and 40 are Not Anticipated[4]

"Anticipation requires a showing that each element of the claim at issue, properly construed, is found in a single prior art reference." *Zenith Electronics Corp. v. PDI Comm. Sys., Inc.*, 522 F.3d 1348, 1363 (Fed. Cir. 2008).  As the party challenging the validity of the '581 patent, TEK Corp. "bears the burden of proving invalidity by clear and convincing evidence." *Alexsam, Inc. v. IDT Corp.*, 715 F.3d 1336, 1346 (Fed. Cir. 2013).

Independent claim 27, and dependent claims 28-31, 34 and 40, require "a *receptacle formed in said housing* in communication with said air flow path; and a *port disposed in said receptacle* in communication with said air flow path adapted to sealingly receive a bottle of tire sealant."  A171 (col. 9, lines 63-67) (emphasis added).  TEK Corp. argued that these claims were anticipated by one piece of prior art, U.S. Patent Pub. No. US 2004/0173282 ("U.S. '282").  *See* A48 (18:1-2).  The

---

[4]  TEK Corp. references obviousness in its brief but the brief contains no analysis of obviousness, much less any evidence of a motivation to combine.  Nor could it, because TEK Corp. introduced no such evidence at trial.

jury found that TEK Corp. failed to prove by clear and convincing evidence that U.S. '282 discloses **both** the receptacle and the port, and therefore these claims were not anticipated. A27-29.

As the district court found, AMI's expert testified that U.S. '282 lacked any receptacle because it merely has a hole. As explained by AMI's expert, a hole does not receive or contain anything and is not formed in the housing. A4378-79 (1106:25-1107:7); A4350 (1078:1-7); A4384 (1112:20-24). This testimony, by itself, is substantial evidence to support the jury's verdict. *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1362, 1364 (Fed. Cir. 2012) (*quoting Streber v. Hunter*, 221 F.3d 701, 726 (5th Cir. 2000)).

For this reason alone, TEK Corp.'s appeal on this point is without merit.

In addition, in its Claim Construction Order, the district court ruled that "receptacle" would be given its plain and ordinary meaning. A25.6-25.7. The district court explained that the function of the "receptacle" is to "sealingly receive a container of sealant." A25.7.[5] AMI's expert witness, Dr. Randall King,

---

[5] TEK Corp. may assert that the holding on the function of the "receptacle" is dicta and, at most, applies only to claim 1. To the contrary, the district court relied on the language of claims 1 and 27 as well as the specification when it explained that the function of the "receptacle" is to "sealingly receive a container of sealant." A25.6-25.7. The specification does not disclose, nor did TEK Corp. identify, any statement that the receptacle does not have to sealingly receive a container of sealant when used with a port.

"testified that the prior art did not disclose a receptacle as the term was construed by the Court." A48 (18:5-7). U.S. '282 lacked a receptacle "because it merely provided a hole into which socket 18 was inserted." A48 (18:7-8). Because the hole cannot sealingly receive sealant, it is not a "receptacle" as required by the claims. *See id.*, n. 82.[6]

TEK Corp.'s expert witness, Dr. Kazerooni, also confirmed that the hole in U.S. '282 "did not perform the function of sealingly receiving sealant," and, therefore, was not a "receptacle." A48-49 (18:9-19:2 & n. 84). Thus, as the district court found, this is additional substantial evidence that supports the jury's verdict. A48-49.[7]

---

[6] TEK Corp.'s argument that the receptacle in claim 27 does not sealingly receive is contradicted by the plain language of the claim, which states that "when said air compressor is activated and a bottle of tire sealant is received in said receptacle, air from said air compressor is forced into the bottle and pushes ***tire sealant*** out of the bottle, ***into said receptacle***, into said air flow path, and into the tire." A171 (col. 10, lines 1-5) (emphasis added). The receptacle therefore "sealingly receives" the tire sealant; otherwise, the sealant would leak when it went into the receptacle. In contrast, U.S. '282's hole is just a hole that never receives sealant, much less "sealingly" so, as conceded by TEK Corp.'s expert. A49, n. 84.

[7] In addition, Dr. King testified that U.S. '282 lacked a port because U.S. '282 "does not disclose any separate piece that is disposed or seated in the receptacle." A49 (19:5-6). Dr. Kazerooni may have disagreed, but as the district court noted, even if the experts' testimony conflicted, the jury was "perfectly entitled" to credit one expert's opinion over another. A49 (19:5-9); *Kinetic Concepts*, 688 F.3d at 1362, 1364.

TEK Corp. contends that Dr. King admitted that U.S. '282 included a "port" but "maintained that the '282 does not disclose a receptacle because it does not show a 'wall' next to the port." TEK's Opening Brief ("Op. Br.") at 31. TEK Corp. misrepresents Dr. King's testimony.

Regarding the port, Dr. King testified that socket 18 "meets the Court's definition of a port in the claim construction order." A4381 (1109:1-7). Dr. King testified, however, that socket 18 was "***not a port as required by the claim element***" in claim 27 of the '581 patent. *Id.* (1109:8-16). Because U.S. '282 did not have a receptacle—as both Dr. King and Dr. Kazerooni testified—screw socket 18 did not satisfy the claim element of a "port disposed in said receptacle." *See id.*

Dr. King also testified that U.S. '282 does not disclose a receptacle, because it has only a hole. *See, e.g.*, A48, n. 82. In response to TEK Corp.'s questions, Dr. King provided an example that, ***had*** U.S. '282 also included a wall around the hole (which it does not), then it could constitute a receptacle, because then the receptacle would be formed in the housing (and presumably would be able to sealingly receive sealant). *See* A4347 (1075:11-23); A4349 (1077:14-20). In other words, contrary to TEK Corp.'s mischaracterization, Dr. King did not testify that a "wall" is necessary to have a receptacle, but only that if U.S. '282 had a wall, then it might meet the claim requirement of a receptacle formed in the housing. *See id.*

Likewise, TEK Corp.'s contention that AMI argued during claim construction that "a 'receptacle' is anything, including a hole, 'that receives or contains something'" (Op. Br. at 32-33) is misleading and inaccurate.  Neither AMI nor the district court stated that a hole would satisfy this claim requirement. *See* A25.6-25.7; A581-82.  As Dr. King testified, a hole does not receive or contain anything and it is not formed in the housing.  Therefore, a hole does not meet the definition of a receptacle.  A48, n. 82.

### B.    <u>Claim 42 is Valid and Infringed</u>

The jury also found that TEK Corp. infringed valid claim 42.  The district court construed the claim term "a reservoir formed in said housing" in claim 42 to mean a "cavity where sealant collects separate from the container."  A25.12.  Dr. Kazerooni "specifically testified that none of the prior art disclosed such a reservoir."  A50 (20:4-5).  Dr. King agreed.  *Id.* (20:5-6).  The testimony of both experts is substantial evidence supporting the jury's verdict.  *Enovsys*, 614 F.3d at 1341.[8]

---

[8] TEK Corp.'s argument that the novelty of the claims is limited to the use of the receptacle and the port is also incorrect.  As determined by the district court, the jury's finding was open-ended as reflected by claims 45-47 (disclosing a disposable feature), which the jury found non-obvious and not anticipated, but did not list in the verdict form.  *See* A52.

TEK Corp. argues that the claim construction is "simply wrong" but provides no basis for its position.[9]  During claim construction, TEK Corp. argued that "reservoir" should be construed the same as "receptacle."  A634-35.  This makes no sense as the specification teaches that the reservoir and receptacle are different structures.  As explained by the district court, "[b]oth receptacle and port are adapted to receive a container or a bottle of tire sealant, whereas as used in claim 42, the reservoir simply is 'adapted to receive tire sealant.'  A25.12.[10]

TEK Corp. also argues—as it did in its JMOL—that Dr. King purportedly admitted that U.S. '282 "discloses a reservoir because sealant collected outside the bottle."  A50 (20:9-15).  The district court rejected this argument because, as Dr. King testified, sealant collecting outside of the bottle is only relevant "if you have a reservoir that meets the requirements of the patent."  A50 (20:11-15).  As both experts agreed, no such reservoir is disclosed in U.S. '282.  *See id.* (20:4-6).

In addition, there is substantial evidence that claim 42 is infringed.  As noted above, the term "reservoir" means a "cavity where sealant collects separate from

---

[9]  In its JMOL, TEK Corp. argued for a different claim construction and the district court appropriately found that this new argument was waived.  A67.

[10]  The use of a reservoir and a container of sealant are not mutually exclusive.  As the district court held, the plain language of claim 42 and the specification require only that the reservoir is "adapted to receive tire sealant," which does not preclude the use of a container of sealant.  A25.12.

the container." A25.12. Dr. King testified that, in TEK Corp.'s kits, the sealant

collects in a cavity separate from the container before going out of a hole into the

hose. *See* A3567-70 (295:22-297:4, 298:9-18). As the district court confirmed,

this evidence is sufficient to support the jury's finding. *Revolution Eyewear*, 563

F.3d at 1370-71.

Any argument that the reservoir in the TEK Corp. tire repair kits would not

hold sufficient volume of sealant to fix a tire is also misplaced as neither the '581

patent nor the claim construction specifies any size requirement for the reservoir.

*See* A4375 (1103:8-23).

Accordingly, there is substantial evidence to support the jury's verdict that

there was not clear and convincing evidence that the '581 patent claims were

anticipated and there is substantial evidence to support infringement of claim 42.


**III.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY ENJOINING TEK CORP.'S INFRINGING TIRE REPAIR KITS SOLD IN COMPETITION WITH AMI**

### A.    AMI Has Suffered and, in the Absence of an Injunction, Would Continue to Suffer, Irreparable Harm

Because "abuse of discretion is a deferential standard of review," *Titan Tire*

*Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1375 (Fed. Cir. 2009), this Court

regularly affirms permanent injunctions as granted. *See, e.g.*, *Acumed LLC v.*

*Stryker Corp.*, 551 F.3d 1323, 1332 (Fed. Cir. 2008) (explaining that even in "a

close case," the "abuse of discretion [standard] compels our decision to affirm the district court").  The few instances in which this Court has vacated or modified permanent injunctions under the abuse of discretion standard involve drastic errors—none of which TEK Corp. has asserted here.  *See i4i Ltd. P'ship v. Microsoft Corp.*, 589 F.3d 1246, 1279 (Fed. Cir. 2009) (modifying effective date of injunction because of lack of record evidence upon which the district court purported to rely); *see also Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1352 (Fed. Cir. 2009) (vacating denial of permanent injunction because the court below "failed to consider any of the *eBay* factors and failed to make any factual findings regarding those factors").

The district court's decision here is thorough and well-reasoned, and the supposed factual errors to which TEK Corp. points reflect only the district court's resolution of contested issues, not any abuse of discretion.  *See Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1311 (Fed. Cir. 2007) (affirming permanent injunction where "[t]he district court considered the detailed testimony on both sides before deciding to issue the injunction").

### 1.    AMI, Through SSI, and TEK Corp. are Direct Competitors

Injunctive relief is particularly apt and regularly granted where, as here, the patent owner and the patent infringer compete.  *See, e.g., Robert Bosch LLC v.*

*Pylon Manuf. Corp.*, 659 F.3d 1142, 1156 (Fed. Cir. 2011) (remanding with

instructions to enter a permanent injunction against an infringing competitor).

"Direct competition in the same market is certainly one factor suggesting strongly

the potential for irreparable harm without enforcement of the right to exclude."

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363

(Fed. Cir. 2012).

Here, there is no dispute that SSI directly competes with TEK Corp. for the

same customers in the OEM market.  *See* A3393-95 (121:13-123:5); A4993-94

(48:17-49:10); A3404-05 (132:25-133:14); A3710-11 (438:20-439:7).  As the

district court concluded, AMI's sales are indisputably directly connected to the

sales of its closely-related sister company.  A71-72; A3351-52 (79:24-80:12);

A3339-41 (67:17-69:5).  As a result, when SSI sells fewer kits to OEMs, AMI sells

fewer kits to SSI.  *See* A3352 (80:8-12).  Thus, even though AMI does not practice

the '581 patent, it directly competes with TEK Corp.[11]  *See* A3639 (367:19-21).

As a result, just like the parties in *Robert Bosch*, AMI directly competes with

TEK Corp. in the OEM market.

---

[11]  As this Court has explained, "[e]ven without practicing the claimed invention,
the patentee can suffer irreparable injury" when it directly competes with the
infringer in the same market.  *Presidio Components*, 702 F.3d at 1363; *Broadcom
Corp. v. Qualcomm, Inc.*, 543 F.3d 683, 703 (Fed. Cir. 2008); *eBay*, 547 U.S. at
393.

### 2.    TEK Corp. Has Taken Market Share from AMI/SSI

A patentee's loss of market share due to a competitor's infringement supports a finding of irreparable injury. *Robert Bosch*, 659 F.3d at 1152; *i4i*, 598 F.3d at 861. Here, TEK Corp. and AMI, through SSI, compete for the same sales. *See* A3351-52 (79:24-80:7); A3394-95 (122:19-123:5).

Accordingly, the district court properly concluded that "AMI has thus lost market share to TEK [Corp.]." A73.

### 3.    The Parties' Competition for Design Wins Supports the Conclusion of Irreparable Harm

The *Emulex* Court held that the actual and potential "exclusion from a fair opportunity to compete for design wins constitutes irreparable harm." 732 F.3d at 1337. This is precisely the case here, as the district court so found. A73.

TEK Corp.'s infringement has allowed it to obtain crucial design wins with OEMs. A6471-72, ¶¶ 2-4. As a result, without an injunction, AMI continues to have to compete against its own technology, which leads to even more design wins and allows TEK Corp. to sell tire repair kits at a lower price than AMI's kits (which incorporate a more expensive cap design). *Id.*; A3702-03 (430:14-431:11).

### 4.     A Causal Nexus Exists Between AMI's Irreparable Injury and TEK Corp.'s Infringement

The district court found a causal nexus between TEK Corp.'s infringement and the harm to AMI.  A68-69.  This finding is supported by the facts and the law.  *See Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1363 (Fed. Cir. 2013) ("the purpose of the causal nexus requirement is to show that the patentee is irreparably harmed *by the infringement*") (emphasis in original).  In *Emulex*, the Federal Circuit found a causal nexus when "the undisputed evidence at trial linked the claimed invention of the '150 patent to the success of the products incorporating it."  732 F.3d at 1337.  Because Emulex and Broadcom were "direct competitors in a limited market, Broadcom's harm was clearly linked to Emulex's infringement of Broadcom's patent property rights."  *Id.*  Here, the harm to AMI is the same.

Claim 27 of the '581 patent teaches a tire repair kit that allows a user to inject sealant into and then inflate a tire.  Thus, the value of the '581 patent is a tire repair kit that allows users to both repair and inflate tires.  The jury found that TEK Corp.'s tire repair kit infringes the '581 patent.  *See* A26.  TEK Corp.'s sales are therefore directly connected to its infringement and those sales cause AMI irreparable harm.[12]

---

[12]  TEK Corp.'s argument that Claim 27 is not "traceably tied" to the infringing kits is wrong.  TEK Corp.'s kits utilize the two-piece design and, indeed, would not function without it.  In addition, TEK Corp. takes Dr. King's testimony about

In addition, Claim 27 of the '581 patent also teaches tire repair kits using a two-piece port and receptacle system.  As TEK Corp.'s expert admitted, the kit would not function without this two-piece system.  A69 (39:9-14); A4260-61 (988:24-989:20).  Therefore, the two-piece system is also indispensable to TEK Corp.'s tire repair kit and the sales of the tire repair kit.  *See* A69.

Just as in *Emulex*, AMI and TEK Corp. directly compete in a limited OEM market.[13]  TEK Corp.'s products infringe AMI's patent, which claims a tire repair kit that includes a two-piece design.  Unlike in *Apple*, AMI's patent does not claim only a portion of a final product sold to consumers:  it claims the tire repair kit with a two-piece design.[14]  Thus, TEK Corp.'s argument that, to prove a causal nexus,

---

the two-piece structure out of context.  In discussing validity, Dr. King opined that it would not be obvious to a person of ordinary skill in the art to create a two-piece structure, because it would add cost and potential for leakage, but he explained that the two-piece structure provides the benefit of "a very quick, easy clean way to remove the bottle of sealant and replace it very easily and cleanly."  *See* A4732 (26:14-21); A4315-17 (1043:16-1044:9, 1044:24-1045:9).

[13]  Neither *Poly-Am., L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303 (Fed. Cir. 2004) nor *Polaroid Corp. v. Eastman Kodak Co.*, 1990 WL 324105 (D. Mass. Oct. 12, 1990) have any relevance here.  *Poly-Am.* involved a motion for new trial on damages, and *Polaroid* dealt with willfulness, damages, and attorney's fees.  Neither case involved a permanent injunction.

[14]  Contrary to TEK Corp.'s argument, the import of *Apple* is that "the causal nexus requirement applies regardless of the complexity of the products."  735 F.3d at 1362.  That Court noted, however, that this requirement "may be more easily satisfied (indeed, perhaps even conceded) for relatively 'simple' products" than for complex products like the smartphones at issue.  *Id.*  Indeed, the *Apple* Court

AMI had to show that the product would not sell as well without the two-piece design misses the mark. Without the two-piece design, TEK Corp.'s tire repair kits would not sell at all and, as a result, TEK Corp.'s sales of tire repair kits that practice the claimed invention of the '581 patent are "clearly linked" to AMI's harm. *Emulex*, 732 F.3d at 1337.[15]

### B.    Money Damages are Inadequate

The district court found that AMI's losses "defy attempts at valuation because TEK Corp.'s infringing acts have significantly changed the market" through TEK Corp.'s reaping of "unwarranted design wins and market share." A76. "Those unquantifiable benefits leave AMI without an adequate remedy at law." *Id.*

The district court's ruling is well-grounded. This Court has held that incumbency benefits are not adequately compensable with monetary damages.[16]

---

acknowledged that in *Robert Bosch* and *Presidio Components*, like here, "the impact that the infringing features had on demand for the products may never have been in doubt." *Id.*

[15] In *Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286 (Fed. Cir. 2007), the Federal Circuit analyzed whether a patentee that does not sell a product can claim *lost profits*. It did not address whether or under what circumstances such a patentee can obtain a permanent injunction.

[16] TEK Corp.'s argument that these benefits already existed is without merit as it is the continued benefit that AMI sought to—and the district court did—enjoin.

*Emulex*, 732 F.3d at 1336 ("money damages were inadequate to compensate Broadcom largely due to incumbency effects from the design-win market conditions").

*ActiveVideo Networks, Inc. v. Verizon Comms., Inc.*, 694 F.3d 1312 (Fed. Cir. 2012) is not to the contrary.  In that case, the patentee and infringer "[did] not compete," and therefore the patentee "[did] not lose market share" from the infringer's sales.  *Id.* at 1337-38.  Thus, the patentee's harm was considered readily calculable because the infringement merely cost it royalties.   *Id.* at 1338.

In contrast, TEK Corp.'s infringement costs AMI not only direct sales, but also design wins and incumbency benefits that cannot be adequately compensated with monetary damages.  *Emulex*, 732 F.3d at 1336.

TEK Corp.'s attempt to dodge around this Federal Circuit law by claiming that AMI does not practice the patent also is without merit.  Whether AMI practices the '581 patent does not affect the analysis of adequacy of monetary damages.  *Trebro Manuf., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1171 (Fed. Cir. 2014); *Presidio Components*, 702 F.3d at 1363.  Likewise, the date on which a patent issued or was acquired has no bearing on the inadequacy of monetary damages.[17]  And there is no basis to find that the amount for which a patent was

---

[17]  In *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828 (3d Cir. 1995), a defendant sought a preliminary injunction to prevent its insurer from

acquired alters the inadequacy of monetary damages.  *See  Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1202 (Fed. Cir. 2010) (imposing permanent injunction even though damages exceeded licensing price).

### C.    The Balance of Hardships Strongly Favors an Injunction

The district court recognized that lost market share, exclusion from design wins, and loss of incumbency benefits are all hardships that AMI would continue to sustain without an injunction, but TEK Corp. could not claim harm from loss of sales and incumbency advantages predicated on infringement.  A76-77.  The district court's ruling is supported by extensive Federal Circuit law.

As the district court explained, "AMI faces substantial hardship because it must compete with its own patented invention in the marketplace."  A76; *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013); *Robert Bosch*, 659 F.3d at 1156; *Emulex*, 732 F.3d 1338.  TEK Corp. elected to build a business on a product found to infringe and now cannot be heard to complain when an injunction against continuing infringement destroys the

settling a case with a plaintiff based on claimed irreparable harm to the defendant's ability to later sue the plaintiff.  The Third Circuit held that because the defendant put itself into the position of possible settlement, it could not claim irreparable harm.  *Caplan* therefore has nothing to do with whether AMI's purchase of the '581 Patent renders its harm from TEK Corp.'s infringement compensable with monetary damages.

business.  *Robert Bosch*, 659 F.3d at 1156; *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n. 12 (Fed. Cir. 1986).[18]

TEK Corp.'s reliance on the impacts to its parent and sister companies in Italy and China, respectively, has no bearing.  *Acumed*, 551 F.3d at 1330 ("the balance considered is only between a plaintiff and a defendant, and thus the effect on customers is irrelevant under this prong of the injunction test.").  Nor does TEK Corp. cite a single case where a permanent injunction was denied based on delay where laches was not present; there is no laches argument here as TEK Corp. did not preserve it before the district court.  *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1376 n. 5 ("We will not decide an issue raised for the first time on appeal.").

Finally, whether the previous owner of the '581 patent, Interdynamics ("IDQ"), did not sue TEK Corp. is irrelevant.  IDQ and TEK Corp. were not competitors and there is no evidence that IDQ was aware of TEK Corp.'s infringing products.  TEK Corp.'s cited cases, which addressed patentees' delays in seeking *preliminary* injunctions are therefore inapposite.  *See, e.g.*, *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012) (delay after party was

---

[18]  TEK Corp.'s reliance on *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341 (Fed. Cir. 1999) is misplaced.  That case did not involve an injunction and therefore did not analyze the balance of hardships.

aware of infringement could be considered in later effort to seek preliminary
injunction).

### D.     The Scope of the Injunction Protects the Public Interest

The public has a general interest in upholding patent rights.  *PPG Indus.,
Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1567 (Fed. Cir. 1996).  Thus, the
"touchstone of the public interest factor is whether an injunction, both in scope and
effect, strikes a workable balance between protecting the patentee's rights and
protecting the public from the injunction's adverse effects."  A78 at n. 217, *quoting
i4i*, 598 F.3d at 863.  The district court correctly concluded that the narrowly
tailored injunction, coupled with a nine-month Sunset Period, struck "the right
balance" in protecting the public interest.  A78.

The district court crafted the Sunset Period to address the competing
interests of the parties, the OEMs, and the public.  Both AMI and TEK Corp. suffer
some harm as a result of the balance that the district court struck:  the Sunset
Period does not permit TEK Corp. to continue unfettered infringement of AMI's
patent, nor does it provide AMI with immediate relief from its competitor's
infringement.

TEK Corp. asserts that the injunction does not benefit the public because it
"would disrupt the operations of TEK Corp.'s suppliers, distributors, customers,

and end users." TEK Corp., however, has never presented any evidence apart from its CFO's unsupported and conclusory statements of any such disruption. For example, TEK Corp. offers no declarations, letters, emails or other evidence from any OEMs, suppliers, distributors, or end users.

Finally, TEK Corp.'s reliance on *eBay* and *Apple* for the proposition that the patented invention is but a small component of the product has no basis. Here, unlike in *Apple*, the claims are directed to the tire repair kit and the tire repair kit would not function without the two-piece receptacle port system.

In summary, TEK Corp. fails to show that the district court committed clear error in finding that the four *eBay* factors were established.

## IV.    SUBSTANTIAL EVIDENCE SUPPORTS THE DAMAGES AWARD

### A.    The Damages Award was Based on Substantial Evidence

"A party challenging a jury's verdict on damages must show that the award is, in view of all the evidence, either so outrageously high or so outrageously low as to be unsupportable as an estimation of a reasonable royalty." *Powell v. The Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1238 (Fed. Cir. 2011) (internal quotations omitted).

During trial, AMI presented testimony of its damages primarily through its expert witness, John Hansen.

1.    **Mr. Hansen Determined a Reasonable Royalty Rate By Analyzing a Hypothetical Negotiation**

An expert may calculate a reasonable royalty rate "by postulating a hypothetical negotiation between a willing licensor and licensee at the time infringement commenced." *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1119 (Fed. Cir. 1996). This hypothetical negotiation may be based on an analysis of the *Georgia-Pacific* factors. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390 (Fed. Cir. 2003) (affirming denial of JMOL and new trial on damages).

a.    Mr. Hansen's Methodology

Mr. Hansen analyzed a hypothetical negotiation as of January 1, 2007. A3737-39 (465:11-467:3). TEK Corp.'s expert, Dr. Nisha Mody, agreed that this was the correct date. A4035 (763:2-6).

b.    Factor One Supports the Royalty Rate Because There Had Been No Previous Licensing of the '581 Patent

Factor one looks at whether there is an established royalty for the patent-in-suit. A3748-49 (476:23-477:6). Mr. Hansen explained that, because the '581 patent has not been licensed, "there's been no establishment of [a] standard royalty rate for this patent." *Id.*

He also testified that the purchase price that AMI paid to IDQ for the '581 patent could not "be used to credibly establish what AMI and TEK would have

agreed to for [a] royalty in 2007." *Id.* Mr. Hansen based this opinion on the facts

that:  (i) AMI and IDQ "are not competitors," (ii) IDQ did not use the patent when

it was sold, (iii) "the purchase price wasn't determined based on what the parties

believed they could have licensed a third party competitor for," and (iv) the patent

purchase agreement specifically disclaimed the validity and enforceability of the

'581 patent.  A3749-52 (477:14-478:19, 479:6-480:4).

 This is the proper analysis under the law.  Courts do not limit reasonable

royalty rates to the purchase prices of patents when evidence shows that those

prices do not approximate the value.  *See, e.g.*, *Finjan*, 626 F.3d at 1211-12 (Fed.

Cir. 2010) (affirming royalty damages in excess of price patentee paid to license

patent because of "multiple differences between the … licensing scenario and a

hypothetical negotiation with Defendants," including fact that patentee did not

compete with licensor but competed with infringer).  IDQ's refusal to guarantee

the validity of the patent also diminishes the credibility of the purchase price as a

royalty basis.  *See Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1347 (Fed.

Cir. 2011) ("a reasonable jury could have chosen to give very little weight" to price

patentee paid for patent-in-suit when validity of patent was uncertain).  Further,

limiting a reasonable royalty to the purchase price would make no sense as it ignores the economic reality that patents can and do change value.[19]

Moreover, TEK Corp.'s argument that IDQ and TEK do not compete fails because, as TEK Corp.'s expert admitted, IDQ would have taken AMI's interests into account at the hypothetical negotiation. A4027 (755:2-4); A4035 (763:7-10).

The jury found that AMI is entitled to a 7% reasonable royalty rate, rejecting TEK Corp.'s argument that AMI deserves a lump-sum royalty set at the purchase price of the patent. *See* A29. The jury's verdict means that it found Mr. Hansen's detailed testimony more persuasive than Dr. Mody's testimony, as it was entitled to do. *See Kinetic Concepts*, 688 F.3d at 1362, 1364.

---

[19]   TEK Corp.'s cited cases are inapposite. In *Laserdynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 80-81 (Fed. Cir. 2012), the patentee's damages expert disregarded the patentee's twenty-nine past licenses of the patent-in-suit to competitors and instead relied on an unrelated license. In *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860 (Fed. Cir. 2003), a decision vacated by the Supreme Court, the Court noted only that the royalty amount "seems unbalanced" in light of the purchase price of a patent portfolio. Neither of these cases applies here, where Mr. Hansen considered the IDQ sale price but disregarded it for several logical reasons. *See* A3749-52 (477:14-478:19, 479:6-480:4).

      c.    <u>Factor Two Supports the Royalty Rate Because TEK
Corp. Pays a 2% Royalty to a Related Entity to License
Only a Patent Application</u>

Mr. Hansen testified that the second *Georgia-Pacific* factor looks at rates

paid by TEK Corp. for the use of other patents. A3753 (481:1-5). Mr. Hansen

reviewed a patent license agreement between TEK Corp. and a related TEK entity,

TEK Global, which allowed TEK Corp. to sell TEK products in the United States.

A3753-54 (481:1-482:12). Because this license was not between competitors and

was for an application but not an issued patent, Mr. Hansen concluded that a

reasonable royalty reached during a hypothetical negotiation between AMI and

TEK would "be worth substantially more than the license of two percent for TEK

[Corp.]." A3755 (483:9-15). This was proper.

TEK Corp. assumes that the TEK license is "irrelevant" and "radically

different" from a hypothetical license for the '581 patent but provides no facts or

law supporting that conclusion. To the contrary, this license was a proper starting

point for the analysis, because it involved identical technology (tire repair kits) as

the '581 patent. *See Internet Machines LLC v. Alienware Corp.*, 2013 WL

4056282, *14 (E.D. Tex. June 19, 2013) (expert properly considered licenses that

"covered the same general field of technology at issue" as data point in analysis).[20]

---

[20] By contrast, TEK Corp. cites cases that involved licenses wholly unrelated to
the technology of the patents-in-suit. *See, e.g.*, *ResQNet.com, Inc. v. Lansa, Inc.*,

Mr. Hansen also testified that a license for the '581 patent would be valuable because it "is an important patent." A3754 (482:13-483:8). Experts may rely on discussions with other experts. *See Scott v. Ross*, 140 F.3d 1275, 1286 (9th Cir. 1998) (affirming admission of expert opinion based in part on "collaboration with other academics"). Here, Dr. King testified without objection that the '581 patent represented a "significant advance in the art of tire repair kits." *See* A4322 (1050:7-21).

      d.     Factor Five Supports the Royalty Rate Because TEK Corp. and AMI, Through SSI, are Direct Competitors

The fifth *Georgia-Pacific* factor looks at the competitive relationship between the parties. A3755 (483:16-22). Mr. Hansen testified that this factor "is usually one of the most important factors" because the "relationship of the parties has a direct influence on the financial impact of granting that license." A3755-56 (483:16-484:9).

---

594 F.3d 860, 870-72 (Fed. Cir. 2010) (evidence of royalty rates from licenses without a relationship to the claimed invention could not form the basis of a reasonable royalty calculation); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009) ("licenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit").

Mr. Hansen explained that AMI and TEK Corp. are competitors, because AMI sells products to SSI, which "competes directly for sales" with TEK Corp. A3756 (484:10-19). Mr. Hansen testified that this competitive relationship "would dictate or require [a] higher royalty rate" because TEK Corp. would be paying "to have the right to compete with SSI and AMI for those sales." A3756 (484:20-24). The direct competition supports a higher royalty rate. *Minco*, 95 F.3d at 1119-20 (affirming 20% royalty rate in part because patentee and infringer "competed head-to-head").[21]

Mr. Hansen testified that, to determine "the potential impact of granting a license to TEK [Corp.]," he looked at the parties' respective gross profit margins. *See* A3757-62 (485:10-490:13). Based on the available financial information, Mr. Hansen calculated AMI's gross margins to be between 24 and 32 percent. A3761 (489:2-13). This amount is significant because "this would be the level of profit that AMI would potentially be giving up by allowing someone to compete with them and take a sale away from them." A3761-62 (489:14-490:1).

---

[21] TEK Corp.'s argument that Mr. Hansen did not "tie proof of damages to particular claims of the '581" has no merit. Op. Br. at 43. In TEK Corp.'s cited case, *Ferguson Beauregard/Logic Controls v. Mega Sys., LLC*, 350 F.3d 1327 (Fed. Cir. 2003), the patents-in-suit were directed to only portions of the infringing products. Here, by contrast, the valid, infringed claims of the '581 patent are directed to the entire infringing tire repair kits with the two-piece port and receptacle structure.

Significantly, TEK Corp.'s expert agreed that "AMI's profit margin could be a consideration at the hypothetical negotiation." *See* A3025-26 (753:23-754:4).

         e.      <u>Factor Eight Supports the Royalty Rate Because TEK Corp.'s Infringing Tire Repair Kits are Profitable</u>

Mr. Hansen testified that the eighth *Georgia-Pacific* factor "looks at the established profitability of the product made under the patent as well as its success and popularity." A3767-68 (495:25-496:6). This factor illustrates what TEK Corp. would be willing to pay for a license based on the potential economic gains TEK Corp. could realize from that license. A3768 (496:7-12).

Mr. Hansen examined TEK Corp.'s business projections, income statements, and witnesses' testimony to determine that TEK Corp. would likely have expected a gross "profit range in the neighborhood of 20 percent." A3768-74 (496:13-502:4).

         f.      <u>Factors Nine and Ten Support the Royalty Rate Because the Invention of the '581 Patent is Important to TEK Corp.</u>

Factors nine and ten address "the advantages of practicing the patent and the benefits of practicing the patent." A3778 (506:16-25).

Mr. Hansen testified that, because the '581 patent is foundational or important, it is more valuable than an unimportant patent. A3779 (507:1-8). Mr.

Hansen also noted that TEK Corp. "has also not presented any design alternatives .

. . to avoid infringement." *Id.*[22] This further demonstrates "that this is an

important invention for them to use." *Id.*

        g.    <u>Factor Eleven Supports the Royalty Rate Because TEK
Corp. Has Profited from Infringing the '581 Patent</u>

Factor eleven analyzes "the extent to which the infringer has made use of the

invention." A3779 (507:9-19). Mr. Hansen explained that TEK Corp. has sold

approximately $18 million in infringing products. *Id.* Mr. Hansen further testified

that infringing sales constitute a majority of TEK Corp.'s sales. A3779-81

(507:20-509:22); A5379.

---

[22] TEK Corp.'s argument that it had a non-infringing alternative is new. *Cf.*
A4650-90, A5469-92 (argument not raised in TEK's JMOL papers). It is therefore
improperly raised for the first time on appeal. *Innogenetics*, 512 F.3d at 1376 n. 5
("We will not decide an issue raised for the first time on appeal."). In addition, this
argument is wrong because there is no evidence that TEK Corp. had a non-
infringing alternative that would satisfy the OEMs' specifications, which required
a re-usable structure. A3876-77 (604:15-605:13); A3878 (606:2-5) [OEMs "were
requesting by specification to have a cartridge to refill a product that can be easily
replaced"]. A one-piece structure would not allow a user to replace the sealant
container. Dr. King's testimony also supported that the two-piece structure,
although more expensive to make, had the precise benefit utilized by TEK Corp.'s
infringing kits of allowing a replacement container and hose while still utilizing the
original air compressor. A4316-17 (1044:24-1045:9). TEK's President, Mr.
Marini, also confirmed this benefit. A3878-79 (606:2-607:18); A3991-92 (719:23-
720:11).

### 2.     Based on the Hypothetical Negotiation, Mr. Hansen Concluded That AMI Is Entitled to a 6 to 8% Reasonable Royalty Rate

Based on his analysis of the *Georgia-Pacific* factors, Mr. Hansen concluded

that AMI was entitled to a reasonable royalty rate in the range of 6 to 8% of TEK

Corp.'s infringing sales.  A3784 (512:8-21).[23]  The jury awarded AMI a 7%

reasonable royalty rate.  A29.

### 3.     The Interests of IDQ and AMI Were Properly Considered at the Hypothetical Negotiation

Mr. Hansen's hypothetical negotiation took into account the interests of (i)

the prospective licensee, TEK Corp.; (ii) the then-patentee, IDQ; (iii) the later

purchaser of the patent, AMI; (iv) and AMI's sister company, SSI.  A3742-43

(470:21-471:8).  TEK Corp. contends that AMI's and SSI's interests should not

have been considered in the analysis.  A4681-82.  This was a new argument made

---

[23]  TEK Corp.'s contention that Mr. Hansen's reasonable royalty was "plucked out of thin air" is wrong.  Mr. Hansen started with the 2% royalty rate in the license between TEK Global and TEK Corp., explained why the different facts of the hypothetical IDQ-TEK Corp. license placed upward pressure on that rate, analyzed each of the *Georgia-Pacific* factors, and determined the appropriate royalty rate. Experts are not required to put specific dollar figures or percentage points on each of the *Georgia-Pacific* factors.  *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012) (experts need to provide only "some explanation of both why and generally to what extent the particular factor impacts the royalty calculation").

for the first time in TEK Corp.'s JMOL motion and it is directly contrary to established law *and its own expert's testimony*.

First, Mr. Hansen properly considered AMI's interests at the hypothetical negotiation. Both experts agreed that the hypothetical negotiation may account for later developments under the "book of wisdom" doctrine. *See* A3742-43 (470:21-471:2); A4027 (755:2-4); A4035 (763:7-10). As TEK Corp.'s expert, Dr. Mody, explained, the book of wisdom is "the ability to look at things after the date of the hypothetical negotiation" and "believe that the companies at the hypothetical negotiation know everything." A4034-35 (762:4-763:1). In this case, Dr. Mody explained, the parties at the hypothetical negotiation "know[ ]" that IDQ will sell the patent to AMI. *Id.* ***Thus, Dr. Mody admitted, "by virtue of this book of wisdom that we talked about, AMI could participate in the hypothetical negotiation."*** A4035 (763:7-16). She clarified that "participate" means that "AMI's interests are represented at the hypothetical negotiation." *Id.*[24]

---

[24] TEK Corp.'s contention that Dr. Mody never made such a statement is wrong. Although the district court made a typographical error when it referred to Dr. Mody while citing the testimony of Mr. Hansen in footnote 247, the district court correctly cited Dr. Mody's testimony in footnote 245. That latter testimony evidences Dr. Mody's admission that AMI's interests are properly considered at the hypothetical negotiation. TEK Corp. ignores this testimony.

Worse, TEK Corp. misrepresents Dr. Mody's testimony by claiming that she put AMI at the hypothetical negotiation "only in the role opposite that of the licensor, IDQ." Op. Br. at 39 (emphasis deleted). Dr. Mody never said this. To the

The book of wisdom approach is approved by the U.S. Supreme Court and the Federal Circuit. *See Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698-99 (1933); *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988), *overruled on other grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004) (*en banc*) (hypothetical negotiation analysis "permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators").

*Oracle Am., Inc. v. Google Inc.*, 798 F.Supp.2d 1111 (N.D. Cal. 2011) does not hold otherwise. The district court in that case held that the damages expert erred by hypothesizing a negotiation between the plaintiff, which was not the patentee at the time of the negotiation, and the infringer. *Id.* at 1117. That Court did not address whether the plaintiff-purchaser's *interests* could be considered at the negotiation between the then-patentee and the infringer.

Here, by contrast, the hypothetical negotiation was between IDQ and TEK Corp., but IDQ would take AMI's interests into account by way of the book of wisdom, as TEK Corp.'s expert admitted. *See* A4033-34 (761:25-762:3); A4035 (763:7-16). Unlike in *Oracle*, Mr. Hansen's hypothetical negotiation did not

contrary, she admitted that IDQ, AMI, and TEK Corp. all would be at the hypothetical negotiation. *See* A4027 (755:2-10).

substitute AMI *for* IDQ.  Rather, IDQ and AMI's interests were both present.  Both

parties' experts agreed that this was proper.[25]

Contrary to TEK Corp.'s argument, what *interests* are represented and what

facts are considered at the hypothetical negotiation is a question of fact, not a

question of law.  *See Fromson*, 853 F.2d at 1575.  Here, there is no dispute

between the experts on those factual issues.

Mr. Hansen also correctly considered the interests of AMI's closely-related

sister company, SSI, at the hypothetical negotiation as when SSI makes more sales,

AMI's sales increase by a corresponding amount.  *See* A3834-35 (562:8-563:6);

A3351-52 (79:24-80:12).

Dr. Mody conceded that AMI would consider its "broad financial interest"

and profitability at the hypothetical negotiation.  A4027 (755:13-16); A4035

(763:11-20).  Mr. Hansen explained that, because of the close-knit financial

relationship between AMI and SSI, it would "absolutely not" make any economic

---

[25]  TEK Corp.'s other cited cases do not refute—or even address—the book of
wisdom.  *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858 (Fed. Cir. 1993) stands
only for the unremarkable proposition that the hypothetical negotiation must occur
on the date of first infringement.  *Id.* at 869-70.  And *Studiengesellschaft Kohle,
m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564 (Fed. Cir. 1988) cautions damages
experts to look at patentees' licensing practices as part of their analyses.  Mr.
Hansen's analysis does both.

sense for AMI to ignore SSI's economic interest at the hypothetical negotiation. A3834-35 (562:8-563:6).

The case law confirms that AMI would consider the effect of the license on SSI at the hypothetical negotiation. *See Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co.*, 425 F.3d 1366, 1377-78 (Fed. Cir. 2005), *overruled on other grounds by Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1364 (Fed. Cir. 2009) (district court properly admitted evidence of impact of infringer's sales on patentee's parent company when parent was direct competitor of infringer; "any hypothetical negotiation with the holding company must necessarily include the reality that the economic impact on the [parent] would weigh heavily in all decisions.").

Accordingly, there was substantial evidence to support the jury's verdict of a 7% royalty rate.

## B.    TEK Corp. Failed to Meet Its Burden to Establish That Marking was Required

The district court properly determined that TEK Corp. bore the initial burden to show that the marking requirement is triggered. *See Oracle Am., Inc. v. Google, Inc.*, 2011 WL 5576228, at *2 (N.D. Cal. Nov. 15, 2011) (denying summary judgment on failure to mark when "[infringer] failed to produce evidence establishing acts by [patentee] that would trigger the damages limitation in the

patent-marking statute"). After reviewing the text and purposes of the marking statute, the district court reasoned that, unless an infringer establishes "which specific products are alleged to have been sold in contravention of the marking requirement, a patentee like AMI is left to guess exactly what it must prove up to establish compliance with the marking statute." A79-82. Without such notice, the district court recognized, "AMI's universe of products for which it would have to establish compliance with, or inapplicability of, the marking statute would be unbounded." *Id.* As the district court held, "[i]t would be an odd result to require AMI to bear the burden to show that its predecessor-in-interest either did not sell any product embodying the patent or, if it did, it complied with the marking statute." *Id.* Thus, the district court put the initial burden on TEK Corp. "to put AMI on notice that IDQ may have sold specific products practicing the '581 patent." *Id.*

Because TEK Corp. failed to meet that burden, AMI was not required to prove compliance with the statute. *See Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1219 (Fed. Cir. 2002) ("recovery of damages is not limited . . . where there are no products to mark"). Moreover, TEK Corp. waived this argument below by failing either to request a jury instruction on marking or to object to the damages instructions that were given. *See Funai Elec. Co. v. Daewoo*

*Electronics Corp.*, 616 F.3d 1357, 1374 (Fed. Cir. 2010); *Shiley, Inc. v. Bentley Labs., Inc.*, 794 F.2d 1561, 1570 (Fed. Cir. 1986).

Nonetheless, regardless of the burden of proof, substantial evidence established that there was no product to mark, as Mr. Mueller testified that AMI does not sell a product embodying the '581 patent. A3682 (410:19-24).

TEK Corp. contends that "IDQ offered a '581 product for sale." A4687-88. At trial, TEK Corp. showed Mr. Mueller demonstratives that, TEK's counsel claimed, showed an online sale of a tire repair kit purportedly manufactured by IDQ. A3688-92 (416:20-420:5). As confirmed by the district court, there was ***no admissible evidence*** that this tire repair kit (1) was sold in the United States, (2) embodied the '581 patent, or (3) was not marked with the patent. *See id.*; A82-83. This is insufficient to prove that products that should have been marked were sold. *Texas Digital Systems*, 308 F.3d at 1219; *Oracle*, 2011 WL 5576228, at *2. On the contrary, Mr. Mueller explained that AMI performed a market analysis and concluded that no commercial products embodied the '581 patent. A83; A3709 (437:18-25).[26]

---

[26] Contrary to TEK Corp.'s argument, the testimony of AMI's Brett Mueller relating to pictures that were not admitted into evidence is irrelevant. Fed. R. Evid. 402, 403. Demonstratives that are not admitted at trial are not substantive evidence. *See Baugh v. Cuprum S.A. de C.V.*, 730 F.3d 701, 705 (7th Cir. 2013).

Accordingly, the district court properly granted JMOL for AMI that it had no burden to comply with the marking statute with respect to the alleged IDQ product.  A83 (53:6-8).

In addition, there is no evidence that AMI ever "offered for sale a product that practiced the claims of the '581 patent."  *Cf.* A4687 (38:17-18).  TEK Corp. tries to cobble this contention together from Mr. Mueller's separate testimony that AMI (1) developed a prototype of a semi-automatic tire repair kit and (2) gave Honda the opportunity to select what model it would order.  *See* A3682-83 (410:25-411:12); A3693-94 (421:16-422:8).  But there is no evidence that AMI offered to sell Honda any of those prototypes or even that AMI showed Honda one of those prototypes.  *Cf.* A3693-94.

In addition, even assuming that a prototype was shown to Honda, this would not constitute an offer for sale.  Cases discussing the applicability of the on-sale bar (35 U.S.C. § 102(b)) are instructive, because that affirmative defense, like marking, can only be satisfied by proving that the patentee made an offer to sell its product.  *See, e.g.*, *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206 (Fed. Cir. 1998).  In *Mas-Hamilton*, the patentee's presentation of a prototype to a potential customer and offer to "furnish additional prototypes" was not an offer to sell because "the devices were for testing or show, only, and did not represent commercial sales of the [product] even though money changed hands."  *Id.* at

1216-17.  To the extent AMI even showed Honda a prototype—and there is no

evidence that it did—the result is the same here.

## V.    THE COURT'S DETERMINATION THAT THE '110 PATENT IS INVALID SHOULD BE AFFIRMED

Courts must employ, as the district court did, an expansive and flexible

approach to the question of obviousness.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S.

398, 401 (2007).  When a patent, such as the '110 patent, combines elements

known in the prior art "with each performing the same function it had been known

to perform and yields no more than one would expect from such an arrangement,

the combination is obvious."  *Id.* at 417 (quotation and citation omitted).

The undisputed evidence shows that all of the claimed elements were

disclosed in prior art tire repair kits, including the use of a three-way valve and an

additional hose, that these claimed features performed according to their well-

known function, and that their combination yielded the predictable result of

selectively providing air or sealant to a tire.  In light of this undisputed evidence,

the district court correctly held that the claimed invention was obvious.

### A.    The District Court Properly Construed the Phrase "Additional Hose (83) Cooperating With Said Inflatable Article"

TEK Global challenges the district court's construction of "cooperating with" in the phrase "additional hose (83) cooperating with an inflatable article." Op. Br. at 20-23.  The district court carefully considered the claim language's ordinary meaning, the specification, and relevant extrinsic evidence when construing the phrase "cooperating with" to mean "working together, whether directly or indirectly."  A7-9.  In doing so, the district court  considered, and rejected, TEK Global's construction that "cooperating with" means "directly connected to," a construction made up solely to distinguish the prior art Bridgestone tire repair device from the claimed invention.

The district court first considered that the phrases "cooperating with" and "connected to" both were used within the same claim.  A8; *see also* A150 (col. 5, lines 55-61).  This Court has repeatedly held that the use of two different terms in the same claim supports the conclusion that they have different meanings.  *See Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012) ("The fact that the two adjacent claims use different terms in parallel settings supports the district court's conclusion that the two terms were not meant to have the same meaning.").  The district court determined that, not only did TEK Global fail to overcome the presumption that these different terms have different meanings, but that the ordinary meaning of "cooperating with" means "working

together, directly or indirectly," a construction which is supported by the commonly understood definition of these terms, the specification and file history. A8. Furthermore, the district court concluded that "[t]he intrinsic evidence does not support TEK Global's claim interpretation that 'cooperating' means 'directly connected to' [because] [a]lthough the applicant chose the words 'connectable' and 'connected to' earlier in the language of claim 1, the applicant never uses a variation of 'connected to' regarding the tire and additional hose." *Id.*

The unchallenged evidence regarding the ordinary meaning of "cooperating with" is "working together." A2518 [Merriam-Webster's Collegiate Dictionary] ("to act or work with another or others; act together"); A2521 [Random House Dictionary.com] ("to act or work together or jointly for a common purpose or benefit").

The specification consistently uses "cooperates or cooperating" to mean "working together" and does not use it to mean "directly connected to:"

> When container 3 is screwed into dispenser unit 40, end portion 27b of tubular rod 27—possibly fitted with an annular sealing member 69 on the end—*cooperates* in fluidtight manner with end wall 47 of central portion 45, so that the internal axial passage 27c of rod 27 communicates with and substantially constitutes an extension of conduit 54 (FIGS. 5 and 6).

A149 (col. 3, lines 60-65) (emphasis added). Figures 5 (below) and 6 show that end portion 27b and end wall 47 of central portion 45 are not connected, but work

together so that the axial passage 27c communicates with, and constitutes an extension of, conduit 54.  A146.

The specification also describes that "[v]alve 81 is controlled by a hand-operated selector 85 located on casing 6 and cooperating with an on-switch 86 of compressor assembly 2."  A150 (col. 5, lines 17-19).  The specification proceeds to describe that the selector 85 and on-switch 86 work together with valve 81 to operate the compressor in either of two modes.  *Id.* (col. 5, lines 19-23).  The specification does not disclose how switch 86, selector 85, and valve 81 are physically connected.  Thus, contrary to TEK Global's assertion, the specification and drawings do not equate "cooperating" with "directly connected to."

TEK Global repeatedly relies on the specification's description of the additional hose being "connectable to the tyre" to support its construction of "cooperating with" to mean "directly connected to."  Op. Br. at 21.  This is wrong for two reasons.  First, the statement that the additional hose is "connectable" is consistent with broader claim language that the additional hose "cooperates with" an inflatable article.  Second, "connectable" does not require, or even imply, that the additional hose must be *directly* connected to the tire.  In fact, the specification discloses that "connected to" does not mean "directly connected to."  *Compare* A150 (col.5, ll. 10-16) (describing Figure 7, "Valve 81 is [sic] input connected to

the compressor of compressor assembly 2,") *with* Fig. 7 (below; showing valve 81

is not directly connected to compressor assembly 2, but connected via hose 80).



Fig.7

The specification's use of "connected to" to include indirect connections

also is consistent with the use of the "comprising" in claim 1. Transitional words,

such as comprising, are open-ended and allow for the existence of other

components, such as hose 80, in addition to the claimed features. *See Gillette Co.*

*v. Energizer Holdings Inc.*, 405 F.3d 1367, 1371-73 (Fed. Cir. 2005).

This Court, moreover, has repeatedly held that broadly worded claims

should not be limited to preferred embodiments, such as Figure 7. *See DSW v.*

*Shoe Pavilion*, 537 F.3d 1342, 1347-48 (Fed. Cir. 2008). TEK Global's attempt to

extrapolate structural details from Figure 7 also is improper because, unlike the

other figures, it is not a structural drawing but a schematic of a pneumatic circuit. A148 (col. 2, lines 36-37). *Hochstein v. Microsoft Corp.*, 2009 U.S. Dist. LEXIS 128544, at *21, 44 (E.D. Mich. May 16, 2009) (noting that schematic diagrams are intended to show functional relationships and are not "intended to represent details of … physical mounting and attachment structure."). In addition, TEK Global misstates the law when it asserts that the claim's inclusion of reference number "(83)" limits the claim to the specification. Op. Br. at 21. The MPEP explains that "[t]he use of reference characters is to be considered as having no effect on the scope of the claims." MPEP § 608.01(m); *Hochstein*, 2009 U.S. Dist. LEXIS 128544, at *39.

Finally, contrary to TEK Global's assertion, the prosecution history shows that the examiner's allowance of the claims did not hinge on requiring that an additional hose is *directly* connected to a tire. A945, ¶ 18. The examiner required only that an additional hose and three-way valve selectively direct air from the compressor to the sealant container or to the additional hose. *Id.*

TEK Global asserts—for the first time on appeal—that the district court's construction is inconsistent with the examiner's analysis of Eriksen, *i.e.*, that if "cooperating with" means "working together" and not "directly connected to" then he would have identified pipes 7 or 8 of Eriksen as an additional hose. Op. Br. at 21-23. TEK Global ignores that the claims also required that the additional hose

must be connected to the output of a three-way valve.  A150 (col. 5, lines 55-61).

Unlike Bridgestone, Eriksen did not disclose a three-way valve and, therefore,

pipes 7 and 8 of Eriksen do not meet the additional hose limitation under any

construction of "cooperating with."  A945.  Thus, the examiner's analysis of

Eriksen is entirely consistent with the district court's construction of "cooperating

with."

### B.    The District Court Correctly Determined That Eriksen and Bridgestone Disclosed All of the Claimed Features

Except for the "additional hose" limitation, TEK Global does not challenge

the district court's determination that Eriksen and Bridgestone disclosed all of the

claimed features.  Op. Br. at 23-24; A7.  Thus, the only remaining issue of whether

Bridgestone disclosed the "additional hose" was *not* a factual dispute, but one of

claim interpretation.  Indeed, TEK Global's expert distinguished Bridgestone's air

tube 54 (annotated below) based entirely on the construction of the claim term

"cooperating," which the district court held was a question of law for the court to

decide.  *See* A7 ("whether air tube 54 represents 'an additional hose' hinges on the

construction of the term 'cooperating,' and such a question is one of law to be

resolved by the court") (citing *Phillips v. AWH Corp.,* 415 F.3d 1303, 1330 (Fed.

Cir. 2005)).



Even though SSI's expert, Dr. King, identified first air tube 54 from

Bridgestone as the claimed "additional hose" (A2228), Dr. Kazerooni ignored it

based on the "directly connected to" interpretation of "cooperating with."  Because

first air tube 54 was not directly connected to the tire, Dr. Kazerooni only analyzed

the hose that was "directly connected to" the tire, joint hose 66.  A2304, ¶ 10

("Bridgestone's device only has a single hose [joint hose 66] to the tire

(cooperating with said inflatable article.")); *see also* A2302, ¶ 5.  Dr. Kazerooni

ultimately concluded that joint hose 66 did not meet the claim limitation because,

unlike first air tube 54, it was not directly connected to a three-way valve having a

single input and two outputs.  A2304, ¶¶ 5, 10-11.[27]  Thus, upon construing the

term "cooperating with," the district court rejected TEK Global's sole basis for

challenging whether Eriksen and Bridgestone disclosed all of the claimed features

and held that "there is no genuine dispute that air tube 54 in Bridgestone represents

the element of 'an additional hose' by working together with a tire, even though it

is not directly connected to the tire."  A9.  As a result, the remaining issue before

the district court was only "whether the ordinary skilled artisan would combine the

references to arrive at the claimed invention."  *Id.*[28]

### C.    The District Court Correctly Determined That It Would Have Been Obvious to a Person of Ordinary Skill in the Art to Combine Eriksen and Bridgestone

Having determined that there was no factual dispute about the content of the

prior art and the level of ordinary skill in the art, the district court turned to the

issue of whether it would have been obvious for a person of ordinary skill in the art

---

[27]  The district court construed a three-way valve as "[a] valve with one input and two outputs."  A25.22-23.  Joint hose 66 was connected to a three-way valve having two inputs and one output.  A1908, Fig. 3.

[28]  TEK Global's reliance on *B-K Lighting, Inc. v. Fresno Valves & Castings, Inc.,* 375 F. App'x 28, 32 (Fed. Cir. 2010), is misplaced because, unlike in this case, both experts in *B-K Lighting* raised factual disputes regarding whether the structure and function of the self-releasing taper of the prior art device met the claim limitation under the *same* construction given by the court.  375 F. App'x at 31-32.

to combine Eriksen and Bridgestone.[29]  A9.  After examining the evidence, the

district court determined that the claimed inventions would have been obvious

based on several undisputed facts.

First, Eriksen and Bridgestone are directed to solving the same problem,

which constitutes evidence of motivation to combine in mechanical devices such as

the claimed tire repair devices.  *See Tokai Corp. v. Easton Enters., Inc.,* 632 F.3d

1358, 1371 (Fed. Cir. 2011) (holding that "courts may find a motivation to

combine prior art references in the nature of the problem to be solved, and that this

form of motivation to combine evidence is particularly relevant with simpler

mechanical technologies") (internal citations and quotations omitted).

Second, both Eriksen and Bridgestone offer nearly identical solutions to the

problem of using compressed air to inflate tires or sealant to repair tires.  *Compare*

Eriksen at A1867, ¶ 2 and Fig. 1 *with* Bridgestone at A1893 and A1907-08, Fig. 1.

Third, Bridgestone teaches that a three-way valve with an additional hose

can be advantageously used to selectively provide air or sealant to a tire.  A1896-

97, ¶¶ 12-15.  Bridgestone also discloses that by using a three way-valve and an

additional hose in a tire repair device, both sealant and compressed air can be

supplied to a pneumatic tire without having to refasten a hose.  A1897, ¶ 15.  Thus,

---

[29]  The district court adopted SSI's unchallenged definition of a person of ordinary
skill in the art.  A9; A2218, ¶ 3.

a skilled artisan would have known of these advantages of separating the flow

paths for air and sealant using a three-way valve and an additional hose.  A2220,

¶ 9; A10 ("The discussion within Bridgestone on separating the flow path of air

and sealant liquid in tire-repairing devices demonstrate that practitioners in the art

already understand the advantages and disadvantages between combining and

separating the flow paths.").  Because the use of a three-way valve and an

additional hose in a tire repair kit is no "more than the predictable use of prior art

elements according to their established functions," the district court correctly

concluded that the claims of the '110 patent are obvious.  *KSR*, 550 U.S. at 415-16.

In response to SSI's strong showing of obviousness, TEK Global raised

three points—none of which raised genuine disputed issues of material fact.  TEK

Global's first argument repeated its claim construction argument and fails for the

same reasons given above.  TEK Global's second argument fares no better.  Dr.

Kazerooni asserted that using a single hose to deliver both air and sealant to a tire,

as shown in both Eriksen and Bridgestone, defeated the '110 patent's advantage of

"having an additional hose for delivery of only air to the tire, the tire [sic - air] only

option can be used even after the sealant hose has clogged."  Op. Br. at 26; A2304,

¶ 12.  The district court rejected this argument because the "'110 patent itself

nowhere mentions this purported benefit of having an additional hose" for air only

and there was "no evidence outside of the patent even hinting that sealant clogging

of the hose was somehow long vexing the field." A12; *see also* A148 (cols. 1-2).

Without any supporting evidence, Dr. Kazerooni's *ipse dixit* statements about an

alleged advantage "are not sufficient to avoid summary judgment." *Parallel*

*Networks, LLC v. Abercrombie & Fitch Co.*, 704 F.3d 958, 970 (Fed. Cir. 2013).[30]

Finally, TEK Global relies on Dr. Kazerooni's assertion that AMI's '581

patent teaches away from combining a sealant container with openings at opposite

ends as in Bridgestone with a container having openings at a single end as in

Eriksen. The district court explained that "this distinction was not made in either

Bridgestone or Eriksen, nor was it made in the context of using a three-way valve

or additional hose." A11; *see also* A2303, ¶ 9. The district court further relied on

Bridgestone's disclosure of using a three-way valve and additional hose as an

improvement on a prior art tire repair device having a container, like Eriksen's

(below right), with intake and exhaust openings at one end. A11; *see* A1908-09

Fig. 3 (below left).

---

[30]  TEK Global incorrectly characterizes Bridgestone's use of first air tube 54 and heater 70 as preventing sealant from prematurely hardening in the tire. Op. Br. at 26. Bridgestone discloses the use of a heater 70 with the first air tube 54 so "the hardening time of the sealing agent injected into the pneumatic tire can be shortened…" A1898, ¶ 0016. Bridgestone further describes that heater 70 addresses the issue of "stabilization of the hardening time of the sealing agent 36" to prevent the sealant from hardening *in the tire* too soon or too late. A1903, ¶ 0045. As the district court concluded, nowhere does Bridgestone, or any other evidence in the record, describe a problem with the sealant clogging *in the hose*.



Fig. 1

Thus, based on an examination of the parties' evidence, the district court correctly determined that the content of the prior art, the scope of the claims, and the level of ordinary skill were not in material dispute, and the obviousness of the claim was apparent in light of these factors. As such, summary judgment was appropriate. *KSR*, 550 U.S. at 427; A18.

D.    **The District Court Determined That Evidence of Secondary Considerations of Nonobviousness, if Any Existed, Did Not Overcome the Strong Showing of Obviousness.**

The Federal Circuit repeatedly has held that secondary considerations of nonobviousness cannot overcome a strong prima facie case of obviousness. *See Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008).

Federal Circuit law also establishes that the patentee must prove a nexus between the evidence of commercial success and the patented invention. *See In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996) (holding that the proponent must offer

proof "that the sales were a *direct result* of the unique characteristics of the claimed invention") (emphasis added).

In this case, TEK's expert relied on the purported commercial success of TEK's tire repair kits.  A2306, ¶ 19.  Yet, Dr. Kazerooni admitted that he did not analyze whether factors such as pricing, advertising, or non-patented features were the reason for any commercial success of TEK's tire repair kits.  A2530-A34.  For this reason, the district court properly rejected TEK's unsupported assertion.  A12.[31]

TEK's assertion of long felt was based on the unsupported assumption that clogging in the hose was a problem.  A2305, ¶ 18.  There is no evidence that this assumption is true and neither TEK Global nor Dr. Kazerooni identified any evidence of such a problem.  *Id.*; *see also* A148 (cols. 1-2).  Without any supporting evidence, Dr. Kazerooni's *ipse dixit* statements are not sufficient to overcome a strong showing of obviousness.  *Leapfrog Enters. v. Fisher-Price, Inc.*,

---

[31]  For this same reason TEK Global's reliance on *Opryland USA Inc. v. Great Am. Music Show, Inc.*, 970 F.2d 847 (Fed. Cir. 1992) is misplaced.  TEK presented no evidence of commercial success other than its expert's *ipse dixit* statements.  The district court properly gave such statements little weight.  TEK Global's reliance on Dr. King's statements regarding commercial success also is unavailing as there was no evidence of commercial success that could be attributed to the '110 patent rather than the '581 patent on which TEK Corp. infringed.  A20-23.

485 F.3d 1157, 1162 (Fed. Cir. 2007); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).[32]

For these reasons, the district court properly rejected this "evidence" of secondary considerations of nonobviousness and held that it did not overcome the strong evidence of obviousness.  A12-13.


## VI.    THE TRIAL COURT'S DENIAL OF PLAINTIFFS' EXCEPTIONAL CASE MOTION SHOULD BE VACATED AND REMANDED

The district court held that this case was not "exceptional" because AMI did not prove its arguments "by clear and convincing evidence."  *See* A91-94 (*citing Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378 (Fed. Cir. 2005)).  However, the *Brooks Furniture* standard applied by the district court is no longer applicable in light of the Supreme Court's recent decision in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. ___, 134 S. Ct. 1744 (2014)

---

[32]  TEK's reliance on *Weather Eng'g Corp. of Am. v. United States*, *Knoll Pharm. Co., Inc. v. Teva Pharms. USA, Inc.*, and *In re Chu*, is misplaced.  In *Weather*, the Court noted that the advantage, while not disclosed in the patent, was disclosed to the examiner during prosecution.  614 F.2d 281, 284 n.4 (Ct. Cl. 1980).  In *Knoll*, the patent owner submitted later obtained test data supporting advantages of the invention.  367 F.3d 1381, 1385 (Fed. Cir. 2004).  And, in *In re Chu*, the patent applicant supplied technical articles supporting the advantages of the claimed invention over the prior art.  66 F.3d 292, 298 (Fed. Cir. 1995).  Here, unlike the inventions in *Weather*, *Knoll*, and *Chu*, there is no evidence that using an additional hose to prevent clogging was an advantage in the claimed invention.

("*Octane Fitness*").  In *Octane Fitness*, the Supreme Court overruled *Brooks Furniture* and held that that "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position ... or the unreasonable manner in which the case was litigated."  *Id.* at 1756.  The Supreme Court also held that entitlement to fees need not be shown by clear and convincing evidence.  *Id.* at 1758.

Accordingly, this Court should vacate the district court's ruling on the attorneys' fee motion and remand to the district court for reconsideration in light of the new standard set forth in *Octane Fitness*.  *See Checkpoint Systems, Inc. v. All-Tag Security Americas, Inc.*, --- Fed. App'x ----, 2014 WL 4358440, *1-2 (Fed. Cir. Sept. 4, 2014) (vacating district court's earlier ruling on exceptional case motion and remanding in light of *Octane Fitness*).

Under the *Octane Fitness* standard (as well as the old standard), this case is exceptional for the following reasons.

For both TEK's infringement claim against SSI and TEK's defense of AMI's infringement claim, the evidence available at or near the outset of litigation showed that TEK was going to lose.  In both instances, rather than play by the rules, TEK simply made up evidence or manufactured a non-existent defense. Either of these unreasonable actions justify finding that TEK's conduct stands out from the ordinary case.

<u>First</u>, by no later than November 2011 when SSI disclosed the Bridgestone reference, TEK knew or with a minimum of effort could have known that the '110 patent was invalid.  A6073, ¶ 2; A6080; A6084.  But TEK did not dismiss its case.

Instead, after the close of fact discovery, Dr. Kazerooni claimed that TEK's '110 patent was entitled to a priority date before that of the key piece of prior art, Bridgestone, based on the translation of an Italian patent application that led to the '110 patent.  A6073, ¶ 3; A6103-05; A6129.  TEK had never produced that translation during discovery.  A6073, ¶ 3.  Suspicious that it had somehow missed this critical fact, SSI questioned Dr. Kazerooni at his deposition about the translation of the Italian application on which he based his priority theory.  A6073, ¶ 4; A6135-50.  SSI's questioning revealed additional suspicions that the translation may not have been accurate.  Notably, TEK's counsel remained silent about the translation before, during and after Dr. Kazerooni's deposition.  A6073-74, ¶ 5.

To get to the bottom of the translation issues, SSI sought and obtained a Court Order compelling TEK to produce all of its communications with the company that had translated the Italian application.  A2856-61.  Those emails (as well as a declaration SSI obtained from the director of the translation company) confirmed that TEK had sent the translators a copy of the '110 patent—which, unlike the original Italian application, contains the three-way valve and additional

hose in claim 1—and told the translators that it was a "translation" of the Italian application. A6219; A6348, ¶¶ 2-3. Those emails further confirmed, at a minimum, that *prior to Dr. Kazerooni's deposition* TEK knew that the translation was incorrect and had received a corrected translation. A6157-60; A6335-37. Yet, TEK failed to (1) inform SSI that the translation was erroneous, (2) withdraw Dr. Kazerooni's opinion based on that incorrect translation, or (3) provide the corrected translation to SSI either before or at the deposition. A6073-74, ¶ 5.

Moreover, in opposing SSI's motion to compel, TEK argued that it had sent the '110 patent to the translators to use as a "glossary." A2673. However, this claim was contradicted by the declarations of TEK's then-counsel (A2703-05), his administrative assistant (A2850-52), and the director of the translation company (A6348, ¶¶ 2-3), none of which referred to a "glossary" or even asserted that the '110 patent was called anything other than a translation.

SSI painstakingly uncovered the false translation and ultimately forced TEK to withdraw Dr. Kazerooni's report based on the false translation. A6075, ¶ 9; A6341-42.

SSI ultimately prevailed on summary judgment that the '110 patent was invalid in light of Bridgestone and other known prior art. A5-18. Had SSI not discovered TEK's sham translation, however, TEK potentially could have defeated summary judgment by knocking out Bridgestone, based on a false translation.

This evidence by itself is sufficient to justify a remand to the district court for further proceedings. *See Checkpoint Systems*, 2014 WL 4358440, at *1-2.

Second, in its expert's rebuttal report, also from Dr. Kazerooni, TEK claimed for the first time that its tire repair kits did not infringe the '581 patent because the TEK kits purportedly did not allow air and sealant to mix in the air flow path. A6076, ¶ 16; A6368-70. This physical mixture theory was based entirely on a conversation between Dr. Kazerooni and Mr. Marini, the president of TEK. A6368-70, nn. 12, 14. This new defense was never mentioned during fact discovery, even though AMI sought this information in both interrogatories and depositions. A6075-76, ¶¶ 13 & 15; A6350-52; A6365. Even after TEK made up its defense, it failed to supplement its interrogatory responses, in violation of Federal Rule of Civil Procedure 26(e). A6076, ¶ 14.

Once AMI obtained a Court Order requiring Mr. Marini to sit for deposition at the outset of trial regarding this mixture defense, he refused to respond to questions about the mixture defense on instructions from his counsel based on relevance grounds. A6390-92; A6409-10. He also avoided any potential questions about his conversation with Dr. Kazerooni by claiming that they had never spoken before until trial. A6389.

The mixture defense is, and was at the time, contradicted by the available evidence, all of which TEK knew years before this litigation commenced. In

TEK's tire repair kits, air and sealant mix both in the sealant container and in the hose from the container to the tire.  TEK's own instructional video, created in 2005, shows that air and sealant mix in the hose.  *See* A6413; A6418-20.  Moreover, Dr. Kazerooni and Mr. Marini each admitted under cross-examination that the sealant container contains both air and sealant, and that the air has to travel through the sealant to get to the top of the container.  A6426; A6450.

Indeed, when Mr. Marini was questioned about the mixture defense at trial, Mr. Marini repeatedly lied under oath and was impeached by his deposition testimony.  *See* A6417-18; A6422-23; A6424; A6426-27.  After Mr. Marini was impeached regarding the mixture defense, Dr. Kazerooni attempted to claim—for the first time—that the '581 patent required a *chemical* mixture, such as a foam or a mist, rather than a physical mixture.  A62-63 (district court finding that Dr. Kazerooni "changed his mixture definition"); A4804; A4840-42.  Dr. Kazerooni was forced to back away from this new testimony on cross-examination.  A6444.

The Federal Circuit has held that testifying falsely can constitute litigation misconduct sufficient to justify an exceptional case determination.  For example, in affirming an attorneys' fee award under the clear and convincing evidence standard, the Federal Circuit held that the "repeated false claims during discovery, trial, and post-trial, by Qualcomm's attorneys and witnesses" constituted "litigation misconduct findings . . . sufficient standing alone to support the exceptional case

determination here." *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1027 (Fed. Cir. 2008).

Moreover, TEK instructed Dr. Kazerooni to not test its tire repair kits. A6142; A6445-46. The reason why is obvious: testing would have revealed, as it did for Dr. King, that air and sealant mixed in TEK's tire repair kits. A party's failure to test the accused products before filing suit or asserting defenses can make a case exceptional. *See, e.g.*, *Eltech Systems Corp. v. PPG Indus., Inc.*, 903 F.2d 805, 810 (Fed. Cir. 1990) ("studied ignorance" supports a finding of bad faith).

Notably TEK has not even challenged the infringement verdict on appeal. TEK's conduct in proceeding with its mixture defense and its conduct during trial on the mixture defense therefore also warrants a remand to the district court for further proceedings. *See Checkpoint Systems*, 2014 WL 4358440 at *1-2.

## CONCLUSION

For the foregoing reasons, the district court's rulings and orders all should be affirmed, with the exception of its denial of Plaintiffs' exceptional case motion, which should be vacated and remanded for consideration in light of the new standard set forth in *Octane Fitness*.

Dated: October 20, 2014

/s/ Stanley M. Gibson
Stanley M. Gibson (Bar No. 162329)
Gregory S. Cordrey (Bar No. 190144)
Andrew I. Shadoff (Bar No. 272319)
Jeffer Mangels Butler & Mitchell LLP
1900 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-4308
Telephone:   (310) 203-8080
Facsimile:    (310) 203-0567
*Attorneys for Plaintiffs - Cross-Appellants*

**CERTIFICATE OF SERVICE**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 1900 Avenue of the Stars, 7th Floor, Los Angeles, California 90067.

On October 20, 2014 I served the document(s) described as **BRIEF OF PLAINTIFFS AND CROSS-APPELLANTS SEALANT SYSTEMS INTERNATIONAL, INC. AND ACCESSORIES MARKETING, INC.** in this appeal addressed as follows:

Jon Streeter
Dan Jackson
Keker & Van Nest, LLP
633 Battery Street
San Francisco, CA 94111
Email: jstreeter@kvn.com
Email: djackson@kvn.com

☒ (BY MAIL) True and correct courtesy copies of the aforementioned document(s) were deposited, in a sealed envelope with postage thereon fully prepaid, with the U.S. Postal Service on that same day to be mailed via first class mail at Los Angeles, California. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☒ (TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)) Pursuant to the controlling Rules, the aforementioned document(s) will be served by the court via NEF and proper link(s) to the document(s). On October 20, 2014, I checked the appropriate CM/ECF docket for this case or proceeding and determined that the aforementioned person(s) has/have consented to receive NEF transmission at the aforementioned electronic addresses.

Executed on October 20, 2014, at Los Angeles, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____ */s/ Andrew I. Shadoff* _____

Andrew I. Shadoff

Form 19

FORM 19.  Certificate of Compliance With Rule 32(a)

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☑    The brief contains [        16,302        ] words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐    The brief uses a monospaced typeface and contains [ *state the number of* ] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☑    The brief has been prepared in a proportionally spaced typeface using
[                    *Microsoft Word 2010*                    ] in
[                *14-point Times New Roman font*                ], or

☐    The brief has been prepared in a monospaced typeface using
[        *state name and version of word processing program*        ] with [
[        *state number of characters per inch and name of type style*        ].

_____
(Signature of Attorney)

Andrew I. Shadoff
_____
(Name of Attorney)

Attorneys for Plaintiffs-Cross-Appellants
_____
(State whether representing appellant, appellee, etc.)

October 20, 2014
_____
(Date)

Reset Fields