**2014-1405, -1428**

*In The*

# United States Court of Appeals for the Federal Circuit

SEALANT SYSTEMS INTERNATIONAL, INC.
and ACCESSORIES MARKETING, INC.,

*Plaintiffs-Cross-Appellants,*

– v. –

TEK GLOBAL, S.R.L. and TEK CORPORATION,

*Defendants-Appellants.*

*Appeals from the United States District Court for the Northern District of California in Nos. 5:11-cv-00774-PSG and 5:11-cv-01649-PSG, Magistrate Judge Paul S. Grewal.*

**NON-CONFIDENTIAL**
**DEFENDANTS-APPELLANTS' REPLY IN SUPPORT OF EXPEDITED**
**MOTION TO STAY PERMANENT INJUNCTION**

<div style="margin-left:40%;">

JON B. STREETER, #101970
DAN JACKSON, #216091
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:   415 397 7188

*Attorneys for Defendants-Appellants*
*TEK Global, S.R.L.and TEK Corporation*

November 3, 2014

</div>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................ii

REPLY IN SUPPORT OF EXPEDITED MOTION TO STAY
PERMANENT INJUNCTION ............................................................................... 1

APPENDIX ................................................................................................. A409

CERTIFICATE OF SERVICE

### CONFIDENTIAL MATERIAL OMITTED

The material omitted on page 1 of the Reply Brief describes ongoing confidential discussions with TEK's customers and highly-sensitive and confidential current and potential financial and reputational effects of the permanent injunction on TEK's business. These categories of omitted material were ordered sealed by the district court in the proceedings below.

# TABLE OF AUTHORITIES

*Page(s)*

## Cases

*ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012) ...........................................................4

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
  735 F.3d 1352 (Fed. Cir. 2013) ........................................... 2, 5, 6, 8

*Broadcom Corp. v. Qualcomm Inc.*,
  543 F.3d 683 (Fed. Cir. 2008) .........................................................4, 5

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)............................................................................2

*Finjan, Inc. v. Secure Computing Corp.*,
  626 F.3d 1197 (Fed. Cir. 2010) ........................................................9

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
  185 F.3d 1341 (Fed. Cir. 1999) ........................................................2

*Harris Corp. v. Ericsson Inc.*,
  417 F.3d 1241 (Fed. Cir. 2005) ......................................................10

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ......................................................10

*Poly-America, L.P. v. GSE Lining Technology, Inc.*,
  383 F.3d 1303 (Fed. Cir. 2004) ........................................................3

*Presidio Components, Inc. v. American Technical Ceramics Corp.*,
  702 F.3d 1351 (Fed. Cir. 2012) ........................................................5

*Rite-Hite Corp. v. Kelley Co.*,
  56 F.3d 1538 (Fed. Cir. 1995) .......................................................4, 5

*Robert Bosch L.L.C. v. Pylon Manufacturing Corp.*,
  659 F.3d 1142 (Fed. Cir. 2011) ........................................................5

*Smith & Nephew, Inc. v. Interlace Med., Inc.*,
  955 F. Supp. 2d 69 (D. Mass. 2013)..................................................2

*Standard Havens Products, Inc. v. Gencor Industries, Inc.*,
  897 F.2d 511 (Fed. Cir. 1990) ..........................................................1

*Windsurfing International, Inc. v. AMF, Inc.*,
  782 F.2d 995 (Fed. Cir. 1986) ..........................................................2

*Confidential Material Redacted*

## REPLY IN SUPPORT OF EXPEDITED
## MOTION TO STAY PERMANENT INJUNCTION

If there were ever a case and a record justifying a stay under *Standard Havens Products, Inc. v. Gencor Industries, Inc.*, 897 F.2d 511 (Fed. Cir. 1990), this is it. The magistrate judge here may have written 64 pages in denying TEK's post-trial motions, but he got it manifestly wrong on many points that are now the focus of the appeal, chief among them his decision to issue a permanent injunction. He issued that injunction even though AMI did not own its '581 patent at the time of TEK's alleged infringement; did not buy the '581 until after this case began; has never practiced the '581; does not compete with TEK; and has never suffered, and will not suffer, any legally cognizable harm, much less irreparable harm.

What little AMI says in its opposition about the overwhelming evidence of irreparable harm to TEK is not only cursory but self-contradictory. On one hand, AMI admits that "the Injunction itself" is the cause of the harm to TEK; yet on the other, AMI offers unfounded speculation that perhaps TEK's difficulties are due to "poor sales or other causes." Opp. at 18-19. As the Declarations of Guido Petrelli and ███████████████████████████████████ make abundantly clear, it is the injunction, and the magistrate judge's refusal to stay it, that have put TEK at risk of losing its customers and ███████████████ *See* A276-80; A373-85.[1]

---

[1] AMI claims it is unclear if TEK Corp. or other TEK entities have suffered the harms demonstrated in TEK's moving papers, but offers no evidence to back up the suggestion that TEK is exaggerating its plight. On the contrary, AMI's argument ignores what the record shows. The Petrelli Declarations are expressly about ***TEK Corp.***, which is also ███████████████████. *See* A357-85.

AMI repeatedly cites *Windsurfing International, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986), for the notion that a willful infringer cannot complain about an injunction.  But the jury found that TEK's infringement was ***not*** willful.  A61.  A finding of inadvertent infringement is no reason to disregard the amply demonstrated harm visited upon TEK by the injunction, as the magistrate judge erroneously did, and as AMI still does.  *See*, *e.g.*, *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1353 (Fed. Cir. 1999); *Smith & Nephew, Inc. v. Interlace Med., Inc.*, 955 F. Supp. 2d 69, 79 (D. Mass. 2013).

AMI devotes only a single paragraph to the crucial question of whether and how it will be harmed by the stay.  The only thing AMI says about this is that it "will lose its right to exclude."  Opp. at 17.  But that is incorrect—staying the injunction is not the same as reversing it—and, more importantly, it contradicts *eBay*, in which the Supreme Court unanimously rejected the argument that the "right to exclude alone justifies … permanent injunctive relief."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392 (2006).[2]

---

Notably, AMI never tries to claim an injunction is needed here because the financial peril to TEK creates a risk of inability to pay a money judgment.  TEK has posted security adequate to cover the damages award.

[2] AMI makes much of the public interest element of *eBay*, without appreciating that over-enforcement of patent rights is itself damaging to the public interest.  *See eBay*, 547 U.S. at 396-97 (Kennedy, J., concurring); *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 735 F.3d 1352, 1371-73 (Fed. Cir. 2013).  AMI also denies buying the '581 for leverage in this case.  But what counts is AMI's conduct, not its claimed intent.  Until trial, AMI asserted attorney-client privilege over its reasons for buying the '581, *see* A290:4-292:8, which it did only after TEK sued SSI for

At the core of AMI's opposition is its disingenuous claim, embraced uncritically by the magistrate judge, that it competes with TEK "directly"—by which it means indirectly, "through [SSI,] its sister company"—and that TEK takes sales and market share from AMI "direct[ly]"—by which, again, it means indirectly.  Opp. at 2, 10.  But ***AMI's own witnesses admitted that AMI does not compete with TEK***.  *See*, *e.g.*, A296:15-298:4; A306:19-24; A308:4-309:13; A311:10-19; A313:17-315:22.

The magistrate judge's discussion of this point reads like a "reverse" alter ego finding, allowing affiliated entities to ignore their ***own*** corporate separateness in order to facilitate the pursuit of a claim by one of them.  A107 n.187 (noting common management, sharing of common facilities, sharing of resources and personnel).  His analysis is at odds with *Poly-America, L.P. v. GSE Lining Technology, Inc.*, 383 F.3d 1303, 1310-12 (Fed. Cir. 2004), in which this Court held that a plaintiff cannot rely on its sister company's alleged lost profits as its own.  AMI's only response is a two-line footnote asserting that *Poly-America* "dealt with damages, not a permanent injunction."  Opp. at 11 n.6.  But given that AMI's purported harms are alleged lost profits, the law of lost profits is plainly relevant.  *See Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 703 (Fed. Cir.

---

infringement and SSI countersued for declaratory relief; at which point, AMI went out, bought the '581, and began asserting it in this already-ongoing litigation, falsely claiming to have owned the '581 all along.

2008) (on which AMI relies—mistakenly, as discussed below) (citing the lost-profits case *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1547 (Fed. Cir. 1995)).

In any event, limiting the discussion to injunction cases does not help AMI. In *ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*, 694 F.3d 1312, 1337-38 (Fed. Cir. 2012), for example, this Court held that the district court committed clear error in granting an injunction where—as here—it was not the patentee that lost market share, but the company to which the patentee sold its products. Here, even assuming that SSI lost sales due to TEK's alleged infringement—which is an erroneous assumption, as discussed below—AMI and TEK "do not compete," so the magistrate judge "clearly erred in its reliance on the loss of market share" to SSI, as opposed to AMI. *Id.*; *see* A296:15-298:4; A311:10-19; A313:17-315:22.

Furthermore, AMI's repeated assertions that SSI lost sales to TEK are misleading and legally irrelevant. AMI's witnesses admitted that AMI "***cannot identify one sale that went to TEK that would have gone to SSI but for the infringement of the '581 patent since its purchase by AMI***." A309:10-13 (emphasis added); *see also* A297:15-21. In an effort to explain this away, AMI cites testimony that SSI lost sales to TEK, Opp. at 10 n.5, but that is beside the point. AMI concedes that it must prove that TEK gained a marketplace advantage, causing irreparable harm to AMI, ***as a result of the infringement***. Opp. at 12. AMI cannot prove such harm—or any legally cognizable harm—because it ***did not***

4

hold **"legal title to the patent at the time of the infringement**."  *Rite-Hite*, 56 F.3d

at 1551 (emphasis added).  SSI's only purported lost sales **occurred before AMI**

**bought the '581**.  *See* A297:15-21; A309:10-13.[3]

AMI's position on the all-important issue of causal nexus is legally

unsustainable.  As TEK repeatedly emphasized to the magistrate judge, to no avail,

the injunction runs directly afoul of this Court's ruling in *Apple*.  AMI persuaded

the magistrate judge that SSI's **non-practicing** product—supplied by AMI—would

sell **without the patented feature**, thus necessitating injunctive relief to protect

those sales.  But this necessarily means that the purported harm does not flow from

the alleged infringement, eliminating any possibility of a causal nexus.  *See Apple*,

735 F.3d at 1360-61.  Despite *Apple*, AMI continues to rely heavily upon

*Broadcom*, *Robert Bosch L.L.C. v. Pylon Manufacturing Corp.*, 659 F.3d 1142

(Fed. Cir. 2011), and *Presidio Components, Inc. v. American Technical Ceramics*

*Corp.*, 702 F.3d 1351 (Fed. Cir. 2012), but here, as in *Apple*, "reliance on those

cases is misplaced" because "there is no indication that any of the infringers in

---

[3] AMI dwells on alleged "incumbency" benefits and argues that it is entitled to
protection from the continued effect of past infringement, but even if that were
correct in a situation where it did not own the patent when the infringement took
place—which it is not, *see Rite-Hite*, 56 F.3d at 1551—AMI made no such
showing here.  AMI cites testimony from Chris Auerbach, Opp. at 10 n.5 (citing
A388-89), but on cross-examination, Auerbach admitted that SSI has not lost any
sales to TEK since AMI bought the '581 on April 27, 2011.  *See* A297; *see also*
A283-84.  Likewise, AMI cites Brett Mueller's testimony on cross-examination
that SSI "at some point lost our RFQ's to TEK," A401, but conveniently omits to
mention that Mueller admitted that those alleged lost sales occurred before AMI's
acquisition of the '581.  A309:10-13; *see also* A401:24-25; A428:24-429:2.

those cases challenged the existence of a causal nexus between their infringement and the patentees' alleged harm, so this court did not have occasion to address the issue." *Apple*, 735 F.3d at 1362.

Factually, AMI's position on causal nexus is unsustainable as well. The infringement finding in this case centers on a two-piece tire repair kit that the jury found to be covered by Claims 27-31, 34, 40 and 42 of the '581. AMI's only evidence of a causal nexus is a purported admission from TEK's trial expert that the accused devices "would not function without this two-piece system." Opp. at 12 (citing A320-21). But that not only misstates what TEK's expert said, *see* A320-21, it misses the whole point of the causal nexus test. What TEK's expert really said is that if one removes the bottle of sealant, the device no longer seals punctures, but can only be used as an air compressor. *See id.* That is not even close to an admission that the two-piece feature of TEK's tire repair kits is somehow essential to TEK's success. AMI's expert admitted that the '581 one- and two-piece designs are functionally equivalent—either will work, and, if anything, the simpler one-piece design is preferred. *See* A269; A274. In any event, the causal nexus inquiry looks to whether a patented feature drives marketplace demand, not to whether taking an invention apart will render it inoperable for its intended purpose. *See Apple*, 735 F.3d at 1360-61.

AMI points to no evidence in the record proving, or even hinting at, actual customer interest in the two-piece feature of portable tire repair kits. In fact, the

only evidence in the record that sheds any light on customer behavior points the opposite way.  At trial, AMI's Brett Mueller testified that AMI has produced a prototype for a "semi-automatic" two-piece tire repair kit practicing the '581, A423:25-424:8, and once offered it as an option to Honda, A426:16-427:8.  But when given the choice between the '581 two-piece prototype and a "fully integrated" one-piece tire repair kit design that AMI actually sells, Honda rejected the two-piece prototype in favor of AMI's existing design.  *Id.*  Thus, the record affirmatively shows that there is nothing so uniquely special about the '581's two-piece design suggesting that this feature, alone, drives customer demand.  Quite the contrary.  *See id*; A269; A274.[4]

In an effort to salvage its position on causal nexus, AMI points to its expert's *ipse dixit* that the '581 design provides a quick and easy way to remove the sealant bottle, Opp. at 11 n.7, but that testimony was ***stricken***, except as it applies equally

---

[4] In addition to exposing the absence of any causal nexus between the infringement found by the jury and market demand, Mueller's testimony about the '581 undermines AMI's claim that it "purchased the '581 patent to avoid the costs necessary to design around the patent in future tire repair kits."  Opp. at 3.  Mueller testified that, in analyzing the potential benefits of purchasing the '581, AMI was focused on Claim 1 of the '581, A417:24-418:1, which the jury found to be invalid. *See* A62.  Claim 1 covers a one-piece tire repair kit design.  According to Mueller, AMI thought that this aspect of the '581 would allow it to eliminate an expensive "cap" in its own, fully integrated one-piece design.  A417:4-8.  AMI, in fact, never made that design change.  A424:16-19.  Mueller also testified that AMI saw no market for the '581 two-piece design in the United States.  A424:23-425:11.  So the sum and substance of this testimony is that AMI claims to have bought the '581 to facilitate a design change that it never made, and to sell products for which it saw no market.  AMI's only actual use of the '581 is in this litigation.

to **all** of the '581 claims.  *See* A269; A274; A440:13-441:14; 442:7-446:2.
Because the jury found that Claims 22-24 and 38 are invalid, the general '581
benefits of "quick and easy" bottle removal **are not novel**.  *See* A62.  That destroys
any possible support for the idea that the two-piece feature of the infringed claims
is somehow "indispensable."  Opp. at 12; *see*, *e.g.*, A62; A269; A274.  On the
record presented here, given the total absence of any evidence that the
infringement found by the jury accounts for TEK's marketplace success, the
injunction in this case does exactly what the causal nexus requirement is designed
to prevent: it allows a failed competitor to "leverage its patent for competitive gain
beyond that which the inventive contribution and the value of the patent warrant."
*Apple*, 735 F.3d at 1361 (citation omitted).

     AMI attempts to distinguish *Apple* by arguing that the '581 "does not claim
only a portion of the finished product."  Opp. at 12 n.8.  But again, that contention
fails to focus on the specific claims at issue here.  The only thing that saved the
claims found to be infringed from a finding of invalidity was the jury's
determination that the two-piece design feature is novel.  A63.  As discussed, that
supposed point of novelty provides no benefit over the claims the jury expressly
found **not** to be novel and threw out as invalid.  *See* A62; A269; A274.  The sole
basis of the infringement finding here—the two-piece design feature—is therefore
not only a mere "portion of the finished product," but a portion that admittedly
lacks value, much less "indispensable" value.  *Compare id. with* Opp. at 12.

In response to TEK's point that any alleged harms to AMI are compensable in damages no higher than the $120,000 AMI paid for the '581, AMI cites *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010), as "contrary" authority.  Opp. at 14.  But *Finjan* shows that the price of a patent is presumably its value, and that even a modest deviation from that value in damages, as in *Finjan*, must be proved up.  *See* 626 F.3d at 1211-12.  Yet AMI's expert admitted that his far larger, ***ten-fold*** increase in damages over the patent's established value was not based on ***any*** "specific quantification," which he found "very difficult to do with precision."  A431:3-17; A433:13-A434:7; A435:9-15.

AMI's attempt to save its two-piece receptacle/port claims from invalidity also fails.  AMI continues to argue that the hole in the prior-art '282 is not a receptacle because it does not "sealingly receive a container of sealant," ignoring the fact that in Claims 27-31, 34 and 40 of the '581 it is the "***port***" that "sealingly receive[s] a bottle of tire sealant," not the receptacle.  AMI's expert admitted that socket 18 of the '282 is a port in exactly this sense—the only sense that matters.  A350-54.  AMI responds that, although socket 18 admittedly "meets the court's claim construction for a port," it is "not a port as required by the claim element" because the "hole that the socket goes in" does not satisfy the "receptacle" limitation, although that is satisfied by "something that receives or contains something," and "the socket goes in" the "hole."  Opp. at 8-9 & n.3; A7; A350-54.  AMI's argument boils down to the incoherent assertion that the socket that is

admittedly a port is not a port after all because the hole that contains the socket somehow doesn't contain it. This gibberish is highly unlikely to survive de novo review on appeal. *See* Opp. at 8-9 & n.3; A350-54. The ruling below on Claim 42 is bound for the same fate. TEK has shown, both here and below, that the construction "is simply wrong," A208, and it "strains credulity" for AMI to argue waiver. *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1251 (Fed. Cir. 2005).

Finally, AMI argues that the summary invalidation of TEK's '110 patent will surely be upheld even though the specification expressly states that the "additional hose" of the '110 is "connectable" to the tire, yet the magistrate judge erroneously held the opposite. AMI tries to defend this misconstruction by arguing that the specification was only referring to a preferred embodiment. Opp. at 16. Wrong again. The patent was amended during prosecution, at the examiner's insistence, to make the "additional hose" limitation an element of *every* embodiment. *See* '110 at 5:13-31, Claims 1, 26; A409-413. In the face of the intrinsic evidence, AMI relies on nothing but a dictionary definition of a single word ("cooperating"), taken out of the context of the claims, directly contrary to *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317-24 (Fed. Cir. 2005).

For all of these reasons (and more), this Court should stay the injunction.

DATED:  November 3, 2014

 /s/ *Dan Jackson*
Dan Jackson
Keker & Van Nest LLP
Attorneys for Defendants-Appellants
TEK GLOBAL, S.R.L. and TEK CORP.

# APPENDIX

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**
*Sealant Systems International, Inc. v. TEK Global, S.R.L.* 2014-1405

**APPENDIX IN SUPPORT OF DEFENDANTS-APPELLANTS' REPLY
BRIEF IN SUPPORT OF EXPEDITED MOTION TO STAY PERMANENT
INJUNCTION**

## TABLE OF CONTENTS

| Doc. No. | Date | Description | Appendix Pages |
|---|---|---|---|
| 29-6 29-8 | 04/11/2012 | Excerpts from Application No. 10/891,033 | A409 |
| 198 | 04/17/2014 | Excerpts from Transcript of Proceedings – April 17, 2013, Vol. 3 | A413 |
| | | **Plaintiff's Witness:** | |
| | | *Brett Mueller* | |
| | |    Direct by Mr. Cordrey  (T361) | A416 |
| 201 | 04/19/2013 | Excerpts from Transcript of Proceedings – April 18, 2013, Vol. 4 | A420 |
| | | **Plaintiff's Witness:** | |
| | | *Brett Mueller* | |
| | |    Cross by Mr. McWilliams (T410) | A423 |
| | |    Cross by Mr. McWilliams (T421) | A426 |
| | |    Cross by Mr. McWilliams (T432) | A428 |
| | | *John Hansen* | |
| | |    Cross by Mr. McWilliams (T556) | A431 |
| | |    Redirect by Mr. Gibson (T566) | A435 |
| 282 | 04/23/2013 | Excerpts from Transcript of Proceedings – April 23, 2013, Vol. 7 | A437 |
| | | **Rebuttal Witness for Plaintiff:** | |
| | | *Dr. Randall King* | |
| | |    Direct by Mr. Cordey (T1042) | A440 |
| | |    Direct by Mr. Cordey (T1048) | A442 |

| **Office Action Summary** | Application No. | Applicant(s) |
| | 10/591,033 | MARINI, MAURIZIO |
| | Examiner | Art Unit | |
| | NICOLAS A. ARNETT | 3751 | |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>25 August 2006</u>.

2a)☐ This action is **FINAL**.    2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) <u>1-14</u> is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) <u>1-14</u> is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☒ The specification is objected to by the Examiner.

10)☒ The drawing(s) filed on <u>25 August 2006</u> is/are: a)☐ accepted or b)☒ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☒ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☒ All    b)☐ Some * c)☐ None of:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____.

      3.☒ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)
2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3)☒ Information Disclosure Statement(s) (PTO/SB/08)
    Paper No(s)/Mail Date <u>01/27/2009</u>.

4)☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____.
5)☐ Notice of Informal Patent Application
6)☐ Other: _____.

TEK00217

This is a <u>provisional</u> obviousness-type double patenting rejection because the conflicting claims have not in fact been patented.

### Allowable Subject Matter

17.     Claims 10 and 11 would be allowable if rewritten to overcome the rejection(s) under 35 U.S.C. 112, 2nd paragraph, set forth in this Office action and to include all of the limitations of the base claim and any intervening claims.

18.     The following is a statement of reasons for the indication of allowable subject matter:  the prior art does not disclose nor render obvious a kit for repairing inflatable articles comprising, in combination with the claimed invention as a whole, an additional hose cooperating with said inflatable article and a three-way valve having an input connected to said compressor assembly and an output connected to said container and to said additional hose to direct a stream of compressed air selectively to said container or to said additional hose.

### Conclusion

19.     The prior art made of record and not relied upon is considered pertinent to applicant's disclosure. US Patent 6,789,581 discloses a tire repair kit including a compressor having a casing which defines a seat for a removable container of sealing fluid and further includes a removable dispenser unit having inlet and outlet fittings.  US Patent 7,028,720, US Patent 7,021,348, US Patent 6,968,869, US Patent 6,889,723, US Patent 6,766,834, US Patent 6,736,170, US Patent 6,412,524, US Patent

TEK00227

10/591033

IAP9 Rec'd PCT/PTO 2 5 AUG 2006

PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re Application of | ) | |
| | ) | Examiner: |
| MARINI | ) | |
| | ) | Group Art Unit: |
| Appl. No.: N/A | ) | |
| PCT Appl: PCT/IB05/000309 | ) | Atty. Dkt. No.: 6254.730 |
| | ) | |
| Filed: Herewith | ) | |
| | ) | |

For: KIT FOR INFLATING AND REPAIRING INFLATABLE ARTICLES, IN PARTICULAR TYRES

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## PRELIMINARY AMENDMENT

Sir:

This Amendment is hereby filed with the Transmittal Letter to the United States Designated Office and associated papers as part of the U.S. National phase application.

**Amendments to the Specification** begin at page 2 of this paper.
**Amendments to the Claims** begin at page 3 of this paper.
**Remarks** begin at page 6 of this paper.

A411

TEK00344

comprises elastic means (31) for keeping said control member (30) stably in said closed position in the absence of pressure to said inlet (27c).

5) (Currently amended) A kit as claimed in ~~one of the foregoing Claims~~ Claim 1, characterized by comprising a dispenser unit (40) connectable detachably to said container (3) and having an inlet fitting (53) connected in fluidtight manner to said inlet (27c) of said valve device (18), and an outlet fitting (50) connected in fluidtight manner to said outlet (29a) of said valve device (18).

6) (Original) A kit as claimed in Claim 5, characterized in that said dispenser unit is detachable from said casing.

7) (Original) A kit as claimed in Claim 6, characterized in that said seat (7) comprises a base portion (14) having fast-fit fastening means (49) by which to secure said dispenser unit (40) to said casing (6).

8) (Original) A kit as claimed in Claim 7, characterized in that said fastening means (49) comprise a bayonet connection.

9) (Currently amended) A kit as claimed in ~~one of Claims~~ Claim 5 ~~to 8~~, characterized in that said dispenser unit (40) comprises a cavity (48) to which is fitted a neck (16) of said container (3) in an upside down position; said neck (16) defining said opening (17).

10) (Currently amended) A kit as claimed in ~~any one of the foregoing Claims~~ Claim 1, characterized by comprising an additional hose (83) cooperating with said inflatable article; and a three-way valve (81) input connected to said compressor assembly (2), and output connected to said container (3) and to said additional hose (83) to direct a stream of compressed air selectively to said container (3) or to said additional hose (83).

**A412**

11) (Original) A kit as claimed in Claim 9, characterized in that said three-way valve (81) is controlled by a selector (85) which can be set to a disabling position, in which operation of said compressor assembly (2) is disabled; to a first enabling position, in which operation of said compressor assembly (2) is enabled, and said container (3) is connected fluidically to said compressor assembly (2); and to a second enabling position, in which operation of said compressor assembly (2) is enabled, and said additional hose (83) is connected fluidically to said compressor assembly (2).

12) (Currently amended) A kit as claimed in ~~any one of the foregoing Claims~~ Claim 1, characterized in that at least one of said connecting means (4) and said additional hose (83) is connected to a relief valve (87).

13) (Currently amended) A kit as claimed in ~~any one of the foregoing Claims~~ Claim 1, characterized in that said connecting means (5) comprise a non-return valve.

14) (Original) A kit as claimed in Claim 7, characterized in that said fastening means comprise a fast-fit click-on coupling.

TEK00348

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5

   ACCESSORIES MARKETING, INC.,      )   CV-11-00774-PSG
6                                     )
                    PLAINTIFF,        )   SAN JOSE, CALIFORNIA
7                                     )
           VS.                        )   APRIL 17, 2013
8                                     )
   TEK CORPORATION,                   )   VOLUME 3
9                                     )
                    DEFENDANT         )   PAGES 282-385
10                                    )

11

12              TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE PAUL S. GREWAL
13           UNITED STATES DISTRICT JUDGE

14   A P P E A R A N C E S:

15   FOR THE PLAINTIFF:      JEFFER MANGELS
                             BY:  GREGORY CORDREY
16                                STANLEY GIBSON
                             3 PARK PLAZA, STE 1100
17                           IRVINE, CA 92614

18   FOR THE DEFENDANT:      ADLI LAW GROUP
                             BY:  DARIUSH ADLI
19                                RASHEED MCWILLIAMS
                                  PAYAM MORADIAN
20                           633 WEST FIFTH STREET, STE 6900
                             LOS ANGELES, CA 90071
21

22   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
     PRODUCED WITH COMPUTER.
23

24

25   OFFICIAL COURT REPORTER:      SUMMER FISHER, CSR, CRR
                                   CERTIFICATE NUMBER 13185

**A414**

1

2                        INDEX OF WITNESSES

3     PLAINTIFF'S

4     DR. RANDALL KING (CONT.)
            REDIRECT EXAM BY MR. CORDREY          P. 293
5           RECROSS-EXAM BY MR. MCWILLIAMS        P. 315

6

7     BRETT MUELLER
            DIRECT EXAM BY MR. CORDREY           P. 351
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A415**

1

2                           **BRETT MUELLER,**

3     BEING CALLED AS A WITNESS ON BEHALF OF THE

4     PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND

5     TESTIFIED AS FOLLOWS:

6               THE WITNESS:  I DO.

7               THE CLERK:  THANK YOU.  PLEASE BE SEATED.

8          PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST NAME FOR

9     THE RECORD.

10              THE WITNESS:  FULL NAME IS BRETT CARL MUELLER.  LAST

11    NAME IS SPELLED M-U-E-L-L-E-R.  FIRST NAME IS BRETT, B-R-E-T-T.

12              THE COURT:  YOU MAY BE SEATED, MR. MUELLER.

13         PLEASE PROCEED, MR. CORDREY.

14              MR. CORDREY:  THANK YOU, YOUR HONOR.

15

16              **DIRECT-EXAMINATION BY MR. CORDREY**

17

18    Q.   GOOD MORNING MR. MUELLER?

19    A.   GOOD MORNING.

20    Q.   WHAT IS YOUR CURRENT POSITION AT AMI?

21    A.   I'M THE GLOBAL DIRECTOR OF MANUFACTURING.

22    Q.   WHAT IS A GLOBAL DIRECTOR OF MANUFACTURING?

23    A.   I HANDLE BASICALLY THE OPERATIONS OF THE BUSINESS.  IT

24    WOULD BE NEW PRODUCT DEVELOPMENT LOGISTICS, PURCHASING SUPPLY

25    CHAIN, CUSTOMER SERVICE, QUALITY ASSURANCE, MANUFACTURING AND

1    Q.   OKAY.  AND THE CURRENT CAP IN THE INTEGRATED TIRE REPAIR

2    KIT HAS ALL THOSE FEATURES?

3    A.   IT DOES, YES.

4    Q.   AND WERE THERE ANY OTHER FEATURES IN THE INTEGRATED TIRE

5    REPAIR KIT THAT WOULD BE ABLE TO BE ELIMINATED BY PURCHASING

6    THE '581 PATENT?

7    A.   NO, SPECIFICALLY THE '581 PATENT ALLOWED US TO ELIMINATE

8    THIS EXPENSIVE CAP DESIGN.  THERE ARE CERTAINLY OTHER COSTS

9    THAT CAN BE TAKEN OUT OF THE SYSTEM BY MOVING INTO THE

10   SEMI-AUTOMATIC MARKET.  BUT THEY WOULD NOT BE RELATED TO THE --

11   THEY WOULD NOT BE ASSOCIATED -- FOR EXAMPLE WE WERE HEARING

12   FROM DESIGN ENGINEERS AT OUR OEM CUSTOMERS, FORD, HONDA,

13   GENERAL MOTORS, THAT THEY WERE TRYING TO TAKE COST OUT BUT ALSO

14   MOVE INTO SEMI-AUTOMATIC MARKET FOR THE REASON OF STORING THE

15   COMPRESSOR INDEPENDENTLY OF THE SEALANT BOTTLE.

16   Q.   SO JUST TO BE CLEAR, THE ABILITY TO ENTER INTO THE

17   SEMI-AUTOMATIC, THAT WAS THE OTHER BENEFIT THAT YOU IDENTIFIED

18   AS ASSOCIATED WITH ACQUIRING THE '581 PATENT?

19   A.   IT WAS.  AND SO SUPERVISING INTO THAT SEMICONDUCTOR

20   AUTOMATIC, THERE WAS A SPACE SAVINGS THEN IT INDEPENDENTLY

21   SEPARATING THE FROM THE BOTTLE ALLOWED STORAGE.  IF YOU HAVE A

22   SMALL VEHICLE YOU CAN STORE THE COMPRESSOR ON ONE SMALL STORAGE

23   SPACE IN THE TRUNK AND YOU CAN STORE THE SEALANT ON ANOTHER.

24        SPECIFICALLY THE '581 PATENT TALKS ABOUT MARRYING THOSE

25   TWO TOGETHER IN CLAIM ONE BY SEALINGLY RECEIVING A BOTTLE OF

**A417**

1    SEALANT INTO THE COMPRESSOR.

2         SO THE '581 PATENT ALLOWED US TO MOVE INTO THAT

3    SEMI-AUTOMATIC MARKET.

4    Q.   SO TO BE CLEAR THE SEMI-AUTOMATIC DEVICES HOW ARE THEY

5    DIFFERENT FROM THE AUTOMATIC DEVICES?

6    A.   VERY SIMPLY THE COMPRESSOR AND THE SEALANT ARE SEPARATED

7    FROM EACH OTHER.  SO IT FORCES THE USER OF THE PRODUCT TO TAKE

8    ONE ADDITIONAL STEP USING THE PRODUCT WHICH IS MARRYING THE TWO

9    TOGETHER.

10   Q.   AND AGAIN WHAT ARE THE ADVANTAGES OF HAVING A

11   SEMI-AUTOMATIC TIRE REPAIR KIT AS OPPOSED TO A FULLY INTEGRATED

12   TIRE REPAIR KIT?

13   A.   IN THE SEMI-AUTOMATIC YOU CAN MAKE THE COMPRESSOR SMALLER.

14   YOU CAN ALSO USE A STANDARD SEALANT BOTTLE AND BY STANDARD

15   THERE'S AN A PICTURE OF WHAT A STANDARD SEALANT BOTTLE WOULD

16   LOOK LIKE ACTUALLY IN THIS EXECUTIVE SUMMARY.

17   Q.   AT THE BOTTOM OF THE PAGE THERE SHOULD BE A PAGE NUMBER.

18   IF YOU COULD --

19   A.   PAGE THREE OF THIS EXECUTIVE SUMMARY.

20        SO THE STANDARD SEALANT BOTTLE, THE BLACK AND WHILE DOESN'T

21   DO THIS WELL BUT THE STANDARD SEALANT BOTTLE ON THE BOTTLE ON

22   THE LEFT INCLUDED IN THE MANUAL INJECTION SYSTEM.  SO THAT

23   BOTTLE HAS A FOIL INDUCTION SEAL LIKE YOU WOULD SEE ON A

24   MEDICINE BOTTLE.  A FOIL INDUCTION SEAL ON THE TOP.

25        AND SO THAT BOTTLE IS A LOT LESS EXPENSIVE THAN THE

**A418**

1

2

3

4                    **CERTIFICATE OF REPORTER**

5

6

7

8              I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13             THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23

24   _____

25   SUMMER A. FISHER, CSR, CRR
     CERTIFICATE NUMBER 13185          DATED: 4/17/13

**A419**

1           IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4


5

    ACCESSORIES MARKETING, INC.,      )  CV-11-00774-PSG
6                                      )
                    PLAINTIFF,         )  SAN JOSE, CALIFORNIA
7                                      )
             VS.                       )  APRIL 18, 2013
8                                      )
    TEK CORPORATION,                   )  VOLUME 4
9                                      )
                    DEFENDANT          )  PAGES 386-630
10                                     )

11


12              TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE PAUL S. GREWAL
13              UNITED STATES DISTRICT JUDGE

14   A P P E A R A N C E S:

15   FOR THE PLAINTIFF:      JEFFER MANGELS
                             BY:  GREGORY CORDREY
16                                STANLEY GIBSON
                             3 PARK PLAZA, STE 1100
17                           IRVINE, CA 92614

18   FOR THE DEFENDANT:      ADLI LAW GROUP
                             BY:  DARIUSH ADLI
19                                RASHEED MCWILLIAMS
                                  PAYAM MORADIAN
20                           633 WEST FIFTH STREET, STE 6900
                             LOS ANGELES, CA 90071
21


22   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
     PRODUCED WITH COMPUTER.
23


24


25   OFFICIAL COURT REPORTER:    SUMMER FISHER, CSR, CRR
                                 CERTIFICATE NUMBER 13185

**A420**

1

2                        INDEX OF WITNESSES

3      PLAINTIFF'S

4      **BRETT MUELLER**
            CROSS-EXAM BY MR. MCWILLIAMS          P. 409
5           REDIRECT EXAM BY MR. CORDREY          P. 436
            RECROSS-EXAM BY MR. MCWILLIAMS        P. 442
6

7      **MAURIZIO MARINI**
            DIRECT EXAM BY MR. GIBSON            P. 448
8           (VIDEOTAPE DEPOSITION WAS PLAYED INTO THE RECORD.)

9

10     **JOHN HANSEN**
            DIRECT EXAM BY MR. GIBSON            P. 454
11          CROSS-EXAM BY MR. MCWILLIAMS         P. 513
            REDIRECT EXAM BY MR. GIBSON          P. 559
12          RECROSS-EXAM BY MR. MCWILLIAMS       P. 567

13

14

15     DEFENDANT'S

16     **MAURIZIO MARINI**
            DIRECT EXAM BY MR. ADLI              P. 572
17

18

19

20

21

22

23

24

25

**A421**

CROSS-EXAM BY MR. MCWILLIAMS

1      SO WITH THAT MR. MUELLER, WOULD YOU LIKE TO TAKE THE

2   STAND.

3      AS YOU ARE APPROACHING THE STAND I WILL REMIND YOU

4   MR. MUELLER YOU REMAIN UNDER OATH.

5      THE WITNESS:  YES, YOUR HONOR.

6      THE COURT:  MR. ADLI, WILL YOU BE PRESENTING THE

7   CROSS-EXAMINATION?

8      MR. ADLI:  YOUR HONOR, MR. MCWILLIAMS WILL DO THE

9   CROSS-EXAMINATION.

10      THE COURT:  MR. MCWILLIAMS, IF YOU ARE READY TO GO,

11   YOU MAY PROCEED, SIR.

12

13      **CROSS-EXAMINATION BY MR. MCWILLIAMS**

14

15   BY MR. MCWILLIAMS:

16   Q.   GOOD MORNING, MR. MUELLER, LADIES AND GENTLEMEN OF THE

17   JURY.

18   A.   GOOD MORNING.

19   Q.   YOU TESTIFIED YESTERDAY THAT YOU'RE THE GLOBAL DIRECTOR OF

20   MANUFACTURING FOR AMI; IS THAT CORRECT?

21   A.   THAT'S CORRECT.

22   Q.   AND YOU ARE ALSO THE VP OF OPERATIONS?

23   A.   THAT WAS MY FORMER TITLE AND IT WAS VP OF OPERATIONS AND

24   ENGINEERING.

25   Q.   OKAY.  IN YOUR NEW TITLE DO YOU HAVE AN EXPANDED SCOPE OF

**A422**

CROSS-EXAM BY MR. MCWILLIAMS

1   RESPONSIBILITIES?

2   A.   WE ACQUIRED A GERMAN COMPETITOR THAT ALSO MAKES TIRE REPAIR

3   KITS AND SO THE ORGANIZATION HAS GOTTEN LARGER.

4        SO YES, MY RESPONSIBILITIES ARE THE SAME, HOWEVER THEY HAVE

5   BEEN EXPANDED BECAUSE WE HAVE LARGER PORTFOLIO OF COMPANIES.

6        WE HAVE ALSO ACQUIRED A COMPANY OUT OF TUCSON THAT MAKES

7   CO2 INFLATORS FROM THE BIKE INDUSTRY, SO YES.

8   Q.   AND THAT GERMAN COMPETITOR IS TERRA-S?

9   A.   THE GERMAN COMPETITOR IS TERRA-S.  AND ONE MORE POINT WE

10  ALSO ACQUIRED FIX A FLAT INTO OUR PORTFOLIO.  SO A LOT OF

11  CHANGES.

12  Q.   WHAT'S FIX A FLAT?

13  A.   FIX A FLAT IS AN AEROSOL TIRE SEALANT WHERE THE SLIME

14  PRODUCTS ARE LIQUID TIRE SEALANTS.  FIX A FLAT COMES IN AN

15  AEROSOL CAN.  IT'S A TIRE SEALANT HOWEVER IT'S PROPELLED BY AN

16  AEROSOL.

17  Q.   I HAD ONE OF THOSE IN THE NINETIES I THINK.  IT'S OLD

18  TECHNOLOGY.

19       AMI DOES NOT USE THE TECHNOLOGY CLAIMED IN THE '581

20  PATENT IN THE PRODUCT SOLD TO SSI, CORRECT?

21  A.   THAT'S CORRECT.

22  Q.   AMI DOES NOT HAVE A PRODUCT THAT EMBODIES THE '581 PATENT,

23  CORRECT?

24  A.   THAT IS CORRECT.

25  Q.   YOU TESTIFIED YESTERDAY THAT AMI HAD SEMI-AUTOMATIC

**A423**

CROSS-EXAM BY MR. MCWILLIAMS

1    DESIGNS -- THESE ARE YOUR WORDS, THAT ARE RIGHT IN THE SAME

2    COST STRUCTURE, CORRECT?

3    A.   THAT IS CORRECT.

4    Q.   HAVE THESE DESIGNS BEEN PROTOTYPED?

5    A.   THEY HAVE, YES.

6    Q.   AND DOES THIS PROTOTYPE EMBODY THE CLAIMS OF THE '581

7    PATENT?

8    A.   THEY DO, YES.

9    Q.   HAVE ANY OF THOSE PROTOTYPES BEEN SOLD?

10   A.   THEY HAVE NOT.

11   Q.   DO THE PROTOTYPES HAVE THE '581 PATENT MARKED ON THEM?

12   A.   THE PROTOTYPES DO NOT.

13   Q.   AND YOU ALSO TESTIFIED THAT THE '581 PATENT ALLOWED AMI TO

14   ELIMINATE THE SO CALLED EXPENSIVE CAP DESIGN, CORRECT?

15   A.   I DID, YES.

16   Q.   WAS THIS CAP DESIGN EVER ACTUALLY CHANGED ON AN ACTUAL

17   PRODUCTION TIRE REPAIR KIT?

18   A.   THE CURRENT CAP DESIGN HAS NOT BEEN CHANGED OTHER THAN OUR

19   SEMI-AUTOMATIC SYSTEMS OR A REDESIGN, COMPLETE REDESIGN.

20   Q.   WHEN YOU SAY YOUR SEMI-AUTOMATIC SYSTEMS ARE THOSE SYSTEMS

21   THAT ARE SOLD IN THE MARKETPLACE?

22   A.   THEY ARE NOT CURRENTLY.

23   Q.   AND WHEN YOU TESTIFIED THAT AMI NEEDED TO ACQUIRE THE '581

24   PATENT TO MEET THE COST STRUCTURE OF THE SEMI-AUTOMATIC MARKET,

25   YOU WERE DESCRIBING THE MARKET THAT'S NOT IN THE UNITED STATES,

**A424**

1   CORRECT?

2   A.   THE MARKET FOR SEMI-AUTOMATICS IS MOSTLY IN JAPAN WHERE THE

3   CARS ARE SMALLER.

4   Q.   SO IT'S NOT IN THE UNITED STATES, CORRECT?

5   A.   IT'S NOT CURRENTLY IN THE UNITED STATES AS FAR AS BUSINESS

6   THAT SSI HAS.  THERE ARE SOME SEMI-AUTOMATIC SYSTEMS BEING SOLD

7   IN THE U.S. FROM OTHER COMPETITORS, ACTIVE TOOL WOULD BE ONE OF

8   THOSE COMPETITORS.

9   Q.   SO THERE ARE NO CURRENT SALES OF SEMI-AUTOMATIC KITS IN THE

10  UNITED STATES BY AMI; IS THAT CORRECT?

11  A.   THAT'S CORRECT.

12  Q.   IN FACT, AMI MANUFACTURES ITS PRODUCTS IN CHINA SO IT

13  DOESN'T NEED A U.S. PATENT TO SELL PRODUCTS IN EUROPE, CORRECT?

14  A.   CAN YOU REPEAT THE QUESTION, PLEASE?

15  Q.   YEAH.  AMI MANUFACTURES ITS PRODUCTS IN CHINA, SO IT DOES

16  NOT NEED A U.S. PATENT TO SELL PRODUCTS INTO A EUROPEAN OR

17  JAPANESE MARKET?

18  A.   THAT WOULD BE CORRECT.  THE U.S. PATENT WOULD HAVE NO

19  VALIDITY IN EUROPE.

20  Q.   AND SSI COMPETES WITH ACTIVE TOOLS, BRIDGESTONE,

21  CONTINENTAL AND DUNLOP FOR OEM BUSINESS; IS THAT CORRECT?

22  A.   YES THAT'S CORRECT.

23  Q.   AND ALL OF THOSE COMPETITORS ARE IN ADDITION TO TEK

24  CORPORATION, CORRECT?

25  A.   THAT IS CORRECT.

**A425**

CROSS-EXAM BY MR. MCWILLIAMS

1    Q.   SO YOU TESTIFIED YESTERDAY THAT YOU WERE PURCHASING IT TO

2    SAVE COSTS IN THE MARKETPLACE, CORRECT?

3    A.   THAT'S CORRECT.

4    Q.   YOU ALSO TESTIFIED THAT THERE IS NO U.S. MARKET THAT AMI

5    CAN PARTICIPATE IN RIGHT NOW FOR A SEMI-AUTOMATIC KITS,

6    ATTRACT?

7    A.   NO, THAT WOULD NOT BE CORRECT.  WE HAVE THE SEMI-AUTOMATIC

8    KIT IN THE U.S. MARKET.

9    Q.   YOU HAVE BID IT?

10   A.   WE HAVE BID IT, YES.

11   Q.   YOU WERE SITTING HERE WHEN MR. AUERBACH TESTIFIED THAT AMI

12   HAD NOT RECEIVED ANY REQUEST FOR BIDS FOR A SEMI-AUTOMATIC TIRE

13   REPAIR KITS, CORRECT?

14   A.   I WAS NOT IN THE COURTROOM, I'M SORRY.  I WAS ASKED NOT TO

15   BE PRESENT.

16   Q.   BUT IT'S YOUR TESTIMONY TODAY THAT SEMI-AUTOMATIC TIRE

17   REPAIR KIT BIDS HAVE BEEN RECEIVED?

18   A.   WE HAVE BID THE SEMI-AUTOMATICS, YES.  MOST RECENTLY,

19   HONDA.

20   Q.   AND WHAT WAS THE DATE OF THAT BID?

21   A.   WE WOULD HAVE BID THAT IN MID-2011.

22   Q.   MID-2011.  DO YOU RECALL TESTIFYING AT YOUR DEPOSITION THAT

23   AMI IN FACT HAD NOT RECEIVED ANY BIDS FOR SEMI-AUTOMATIC TIRE

24   REPAIR KITS?

25   A.   WELL AS A BID WE ARE GIVING OUR CUSTOMERS CHOICES, BETWEEN

**A426**

1   YOU COULD HAVE A MANUAL SYSTEM YOU COULD HAVE A SEMI-AUTOMATIC

2   SYSTEM OR A FULLY INTEGRATED SYSTEM.

3       SO WE GIVE THE OPPORTUNITY TO OUR CUSTOMER OF ANY OF THOSE

4   THREE MODELS FOR AN UPCOMING FLAT FORM.

5   Q.   SO DID HONDA REQUEST IT OR DID YOU JUST PROVIDE AN

6   ALTERNATIVE?

7   A.   WE PROVIDED THE ALTERNATIVE AND HONDA ENDED UP GOING WITH

8   THE FULLY INTEGRATED SYSTEM.

9   Q.   AND YOU DID TESTIFY AT YOUR DEPOSITION THAT AMI HAD NOT

10  RECEIVED ANY BIDS FROM OEM MANUFACTURES REGARDING A

11  SEMI-AUTOMATIC TIRE REPAIR KIT, CORRECT?

12  A.   THAT'S CORRECT.  IN THAT CASE ONCE THE DISCUSSION WITH THE

13  ENGINEERS TO GO WITH THE FULLY AUTOMATIC, THEN THE RFQ THE

14  REQUEST FOR QUOTE WOULD COME BACK WITH A REQUEST FOR THE FULLY

15  INTEGRATED SYSTEM.

16  Q.   AND DURING OUR DISCUSSION OF WHETHER ANY BIDS WERE RECEIVED

17  REGARDING SEMI-AUTOMATIC TIRE REPAIR KITS AT YOUR DEPOSITION

18  WHICH TOOK PLACE IN DECEMBER 2012, CORRECT?

19  A.   REPEAT THAT, PLEASE.

20  Q.   I WILL WITHDRAW AND STATE ANOTHER QUESTION.

21  A.   OKAY.

22  Q.   YOUR DEPOSITION TOOK PLACE ON DECEMBER 13TH, 2012, CORRECT?

23  A.   YES, SOUNDS ABOUT RIGHT.

24  Q.   SO THAT WAS AFTER THE MID-2011 DATE THAT YOU JUST SAID THE

25  HONDA BID FOR SEMI-AUTOMATIC KITS OCCURRED, CORRECT?

**A427**

CROSS-EXAM BY MR. MCWILLIAMS

1    Q.   SO KNOWING WHETHER OR NOT SSI IS SELLING AUTOMATIC TIRE

2    REPAIR KITS TO GM FOR THE MALIBU PROGRAM IS WITHIN THE SCOPE OF

3    YOUR RESPONSIBILITIES, CORRECT?

4    A.   IT IS, ABSOLUTELY.

5    Q.   AND IF THOSE PRODUCTS WERE BEING AT ANY PARTICULAR POINT IN

6    TIME, IF ANYBODY WOULD KNOW, YOU WOULD KNOW, CORRECT?

7    A.   I CERTAINLY COULD GO TO MY LAPTOP AND I COULD TELL YOU

8    EXACTLY WHEN THAT PROGRAM STARTED, THE SALES, THE REVENUE, THE

9    COST, YES, I ABSOLUTELY COULD.

10   Q.   IF THE COURT TOOK A BRIEF RECESS, DO YOU HAVE YOUR LAPTOP

11   WITH YOU?

12   A.   I DO NOT.

13   Q.   BUT IT'S YOUR TESTIMONY TODAY, AS YOU SIT HERE, THAT YOU

14   HAVE NO IDEA WHETHER YOU ENTERED THE MALIBU PROGRAM AFTER

15   APRIL 2011?

16   A.   YEAH, AGAIN, I'M NOT SURE WHEN THE FIRST SALES OCCURRED.

17   Q.   AND YOU ARE ALSO NOT SURE WHEN THE BUSINESS WAS AWARDED BY

18   GM, CORRECT?

19   A.   I AM NOT SURE WHEN IT WAS AWARDED.

20   Q.   SO YOU ALSO HAVE NO IDEA WHETHER SSI HAS EVER LOST EVEN ONE

21   SALE TO TEK WITH AN OEM MANUFACTURER, CORRECT?

22   A.   WELL, AS COMPETITORS WE HAVE ABSOLUTELY AT SOME POINT LOST

23   OUR RFQ'S TO TEK.  WE BID ON THE SAME PLATFORMS.

24   Q.   WELL, LET'S BE SPECIFIC.  YOU HAVEN'T LOST ANY RFQ'S TO TEK

25   SINCE THE PURCHASE OF THE '581 PATENT, CORRECT?

**A428**

CROSS-EXAM BY MR. MCWILLIAMS

1    A.   YEAH, I COULD NOT SAY EXACTLY WHICH RFQ'S WE HAVE ONE AND

2    LOST ACROSS THE ENTIRE U.S. MARKET, I COULDN'T SAY.

3    Q.   AND YOU'RE THE INDIVIDUAL AT AMI, SSI WHO THE DAMAGES

4    EXPERT RELIED ON FOR HIS OPINIONS ON WHEN SALES WERE MADE OR

5    NOT, CORRECT?

6    A.   YES, I CERTAINLY, I CERTAINLY PROVIDED UNIT SALES ACROSS

7    ALL THE PLATFORMS TO OUR DAMAGES EXPERT, YES.

8    Q.   AND IN PROVIDING THOSE SALES, THERE'S NO TYPE OF DATE

9    FIGURES ON ANY OF THOSE DOCUMENTS AT AMI?

10   A.   I BELIEVE THE UNIT SALES SPREADSHEETS I PROVIDED TO OUR

11   DAMAGES EXPERT AS WELL AS WHAT I PROVIDED IN DISCOVERY ARE VERY

12   CLEAR.  THEY ARE MONTHLY UNIT SALES VOLUMES.

13   Q.   SO IN PROVIDING THAT INFORMATION DURING DISCOVERY AND

14   PROVIDING IT TO THE DAMAGES EXPERT AND THEN DISCUSSING IT WITH

15   THE DAMAGES EXPERT, I BELIEVE YOU TESTIFIED AT YOUR DEPOSITION

16   THERE WERE THREE TELEPHONE CALLS.

17   A.   SOUNDS RIGHT.

18   Q.   YOU STILL HAVE NO IDEA OF THE DATES WHEN ANY OF THESE

19   PROGRAM IT IS WERE BEING AWARDED OR SOLD, CORRECT?

20   A.   FROM MEMORY I DO NOT.

21   Q.   WITH REGARD TO THE '183 PATENT, WHO WAS THE ASSIGNEE ON

22   THAT PATENT?

23   A.   I DO NOT KNOW WHO IT'S ASSIGNED TO, WHETHER IT'S AMI OR

24   SSI, I DO NOT.

25   Q.   AND I BELIEVE YOU TESTIFIED AT YOUR DEPOSITION THAT IT WAS

**A429**

1    PATENT ON OR ABOUT DECEMBER 20TH, 2005, WHEN IT WAS NOTIFIED BY

2    COUNSEL FOR TEK GLOBAL OF THE INTERNATIONAL SEARCH REPORT

3    PREPARED BY PIPO.  THE INDIVIDUALS INVOLVED WERE MARYLAND OF

4    TEK GLOBAL, AND TEK CORPORATION, SERGIO LOLLI OF TECH

5    AUTOMOTIVE AND DR. EDOARDO MOLA OF STUDIO TORTA.  DATED THIS

6    25TH DAY OF JANUARY 2012.  THEN SIGNED BY THE LAW FIRM OF

7    PILLSBURY WINTHROP.

8         THE COURT:  ALL RIGHT.

9      MR. GIBSON, WHO IS NEXT?

10        MR. GIBSON:  OUR NEXT WITNESS AND ACTUALLY IT WILL BE

11   OUR FINAL WITNESS, YOUR HONOR, IS JOHN HANSEN.

12        THE COURT:  MR. HANSEN, GOOD MORNING SIR.

13        THE WITNESS:  GOOD MORNING.

14        THE COURT:  AS YOU APPROACH THE WITNESS STAND

15   MR. HANSEN I WILL ASK THAT YOU STOP HERE AND ALLOW MY COURTROOM

16   DEPUTY TO SWEAR YOU BEFORE YOU TAKE YOUR SEAT.

17      MR. RIVERA.

18        THE CLERK:  YES, YOUR HONOR.

19

20                    **JOHN HANSEN,**

21   BEING CALLED AS A WITNESS ON BEHALF OF THE

22   PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND

23   TESTIFIED AS FOLLOWS:

24

25        THE CLERK:  PLEASE STATE YOUR FULL NAME AND SPELL

**A430**

1          THE COURT:  YOU MAY.

2          MR. MCWILLIAMS:  CAN I HAVE SLIDE NUMBER FIVE.

3     Q.   IN YOUR SLIDE NUMBER FIVE FOR GEORGIA PACIFIC FACTORS 9 AND

4     10 YOU TALK ABOUT THE ROYALTY RATE BEING INFLUENCED UPWARD,

5     CORRECT?

6     A.   THAT'S CORRECT.

7     Q.   AND HOW MUCH DOES THIS FACTOR INCREASE THE RATE THAT YOU'VE

8     DETERMINED?

9     A.   I DIDN'T PUT A SPECIFIC DOLLAR FIGURE ON IT OR A SPECIFIC

10    ADJUSTMENT OR A SPECIFIC QUANTIFICATION.  BUT HAVING A MORE

11    IMPORTANT PATENT INCREASES THE AMOUNT THAT WOULD BE EXPECTED TO

12    BE AGREED TO.

13    Q.   BUT AGAIN, YOU DID NOT QUANTIFY ANYWHERE IN YOUR REPORT THE

14    AMOUNT OF UPWARD PRESSURE THAT WOULD BE PLACED ON THE ROYALTY

15    RATE.  SO FOR INSTANCE THERE'S NO DETERMINATION THAT IT WOULD

16    BE ONE PERCENT OR 2 PERCENT OR 3 PERCENT, CORRECT?

17    A.   THAT'S CORRECT.  I DIDN'T APPROACH IT IN THAT FASHION.

18    Q.   YOU NEVER DISCUSSED THE PURCHASE PRICE OF THE '581 PATENT

19    WITH ANYONE THAT WAS INVOLVED IN NEGOTIATIONS LEADING TO THE

20    PURCHASE PRICE, CORRECT?

21    A.   THAT'S CORRECT.  NOT THE PERSON WHO NEGOTIATED IT.

22    Q.   AND YOU WERE NOT HERE IN THE COURTROOM DURING

23    MR. AUERBACH'S TESTIMONY, CORRECT?

24    A.   THAT'S CORRECT.

25    Q.   YOU DO KNOW THAT MR. AUERBACH, THE ONLY PERSON INVOLVED IN

1    THE NEGOTIATIONS FOR THE PURCHASE OF THE '581 PATENT, COULD NOT

2    SAY HOW THE $120,000 PRICE POINT WAS ACTUALLY DERIVED, CORRECT?

3    A.   THE SPECIFIC DOLLAR FIGURE?

4    Q.   YEAH.

5    A.   THAT 'S MY UNDERSTANDING.

6    Q.   AND YOU ARE NOT IN A POSITION TO CHANGE MR. AUERBACH'S

7    TESTIMONY AND SAY THE PURCHASE PRICE WAS ACTUALLY BASED ON

8    POTENTIAL COST SAVINGS CORRECT?

9    A.   I'M NOT ATTEMPTING TO CHANGE HIS TESTIMONY.

10   Q.   MR. MUELLER TESTIFIED THAT THE COST SAVINGS DESCRIBED IN

11   HIS EXECUTIVE SUMMARY WERE A JUSTIFICATION FOR THE PURCHASE

12   PRICE, CORRECT?

13   A.   THAT'S CORRECT, THAT IT MADE ECONOMIC SENSE FROM A COST

14   PERSPECTIVE.

15   Q.   AND THERE'S A DIFFERENCE BETWEEN THE JUSTIFICATION AND A

16   BASIS, CORRECT?

17   A.   THAT'S FAIR.

18   Q.   AND YOU DON'T HAVE ANY IDEA WHETHER AMI DID AN ANALYSIS OF

19   THE VALIDITY OF THE '581 PATENT PRIOR TO ITS PURCHASE, DO YOU?

20   A.   I DON'T KNOW ONE WAY OR THE OTHER.

21   Q.   AND YOU DON'T HAVE ANY IDEA WHETHER AMI DID AN INFRINGEMENT

22   ANALYSIS OF THE '581 PATENT, DO YOU?

23   A.   NOT TO MY KNOWLEDGE.

24   Q.   AND DID YOU ASSUME THAT THEY DID NOT DO THESE ANALYSIS IN

25   YOUR ANALYSIS OF THE DAMAGES IN THIS CASE?

**A432**

1    A.   I DIDN'T MAKE AN ASSUMPTION.

2              MR. GIBSON:  OBJECTION.  VAGUE AS TO TIME.

3        I JUST WANT TO MAKE SURE WE UNDERSTAND WHAT THE TIME FRAME

4    THIS IS.

5              THE COURT:  I WILL SUSTAIN THAT OBJECTION.

6        MR. MCWILLIAMS, CAN YOU RESTATE THE QUESTION AS TO -- AND

7    INDICATE WHAT TIME PERIOD YOU ARE ADDRESSING.

8              MR. MCWILLIAMS:  YEAH, SURE.

9    Q.   AND DID YOU ASSUME THAT AMI DID NOT DO EITHER A VALIDITY

10   ANALYSIS OR AN INFRINGEMENT ANALYSIS PRIOR TO ITS PURCHASE OF

11   THE '581 PATENT IN THIS CASE?

12   A.   I DIDN'T MAKE AN ASSUMPTION ONE WAY OR THE OTHER.

13   Q.   SO IF WE LOOK AT GEORGIA PACIFIC FACTOR NUMBER TWO, YOU

14   STATE THAT THE INFLUENCE ON THE ROYALTY RATE IS SUBSTANTIALLY

15   GREATER THAN TWO PERCENT ROYALTY.

16       IS THERE ANYWHERE IN YOUR REPORT WHERE YOU ACTUALLY

17   QUANTIFY A NUMBER FOR WHAT YOU CALL SUBSTANTIALLY GREATER THAN

18   TWO PERCENT?

19   A.   NOT A PARTICULAR NUMBER, BUT I BELIEVE THOSE ARE THE WORDS

20   I USED IN MY REPORT.

21   Q.   AND WHEN YOU TALK ABOUT UPWARD PRESSURE FOR 9 AND 10, YOU

22   DON'T ACTUALLY QUANTIFY A NUMBER, CORRECT?

23   A.   I DON'T TRY TO MAKE A SPECIFIC PERCENTAGE ADJUSTMENT FOR

24   EACH FACTOR.  BUT CONSIDER THEM IN THE TOTALITY OF THE ECONOMIC

25   EVIDENCE.

**A433**

REDIRECT EXAM BY MR. GIBSON

1    Q.   AND WHEN YOU TALK ABOUT FACTOR NUMBER 11, YOU DON'T

2    QUANTIFY AN ACTUAL PERCENT BY WHICH THE RATE RISES UPWARD,

3    CORRECT?

4    A.   NOT FOR THAT FACTOR, THAT'S CORRECT.

5    Q.   AND YOU TESTIFIED PREVIOUSLY THAT THESE ARE THE KEY GEORGIA

6    PACIFIC FACTORS THAT INFLUENCED YOUR ANALYSIS, CORRECT?

7    A.   THAT'S CORRECT.

8            MR. MCWILLIAMS:  NO MORE QUESTIONS, YOUR HONOR.

9            THE COURT:  THANK YOU, MR. MCWILLIAMS.

10        MR. GIBSON, FURTHER EXAMINATION.

11           MR. GIBSON:  THANK YOU, YOUR HONOR.

12

13               **REDIRECT EXAMINATION BY MR. GIBSON**

14

15   BY MR. GIBSON:

16   Q.   DID YOU READ THE DEPOSITION OF MR. AUERBACH?

17   A.   I DID.

18   Q.   AND WHAT DO YOU REMEMBER DID HE TESTIFY, TO YOUR KNOWLEDGE,

19   ABOUT THE NEGOTIATION WITH IDQ OR INTER-DYNAMICS?

20   A.   HE DID.

21   Q.   AND WERE YOU THEN AWARE OF HOW THE NEGOTIATION CAME ABOUT

22   BY VIRTUE OF THAT TESTIMONY?

23   A.   YES.

24   Q.   NOW THERE WAS A NUMBER OF QUESTIONS YOU WERE ASKED.  LET ME

25   SORT OF GO BACK TO THE BEGINNING WHERE THE CROSS-EXAMINATION

**A434**

REDIRECT EXAM BY MR. GIBSON

1    A.   NO.

2    Q.   HAVE YOU HEARD ANY TESTIMONY THAT THERE WERE ANY OTHER

3    PATENTS?

4    A.   ASSUMING YOU ARE TALKING ABOUT --

5    Q.   THIS ONE SINGLE PATENT APPLICATION.  HAS THERE BEEN ANY

6    TESTIMONY THERE WERE PATENTS FROM TEK GLOBAL TO TEK CORPORATION

7    THAT WERE SHOW LICENSED IN THIS AGREEMENT?

8    A.   NOT THAT I'VE SEEN.

9    Q.   NOW IN TERMS OF THE SPECIFIC PERCENTAGES.  YOU WERE ASKED

10   SOME QUESTIONS ABOUT THAT.  WHY DON'T YOU USE SPECIFIC

11   PERCENTAGES AND ASSIGN A SPECIFIC HALF PERCENT, ONE PERCENT TO

12   INDIVIDUAL GEORGIA PACIFIC FACTORS?

13   A.   WELL, IT'S AN ANALYSIS THAT WOULD BE VERY DIFFICULT TO DO

14   WITH PRECISION, IT WOULD REQUIRE A LOT OF JUDGMENTS AND

15   ASSUMPTIONS BUILT INTO IT.

16       SO THE WAY IN THE WHICH I APPROACH THIS WAS TO MAKE SURE

17   I UNDERSTOOD THE OVERALL ECONOMIC POSITIONS OF THE PARTIES AND

18   THE IMPACT OF GRANTING A LICENSE OR TAKING A LICENSE AND THEN

19   LOOKING FOR OTHER LICENSE AND BENCH MARKS.

20       IT'S A VERY COMMON AND ACCEPTED WAY TO COME TO A ROYALTY

21   DETERMINATION.

22   Q.   AND IN A HYPOTHETICAL NEGOTIATION, IT IS COMMON, IS THAT

23   WHAT YOU ARE SAYING?

24   A.   IT'S COMMON IN A HYPOTHETICAL NEGOTIATION AND CERTAINLY IN

25   REAL WORLD LICENSING.

**A435**

1

2

3

4 **CERTIFICATE OF REPORTER**

5

6

7

8          I, THE UNDERSIGNED OFFICIAL COURT

9 REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10 THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11 FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12 CERTIFY:

13          THAT THE FOREGOING TRANSCRIPT,

14 CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15 CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16 SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17 HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18 TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23

24 _____

25 SUMMER A. FISHER, CSR, CRR
   CERTIFICATE NUMBER 13185          DATED: 4/18/13

**A436**

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                     SAN JOSE DIVISION

4

5

  ACCESSORIES MARKETING, INC.,      )  CV-11-00774-PSG
6                                    )
                     PLAINTIFF,      )  SAN JOSE, CALIFORNIA
7                                    )
              VS.                    )  APRIL 23, 2013
8                                    )
  TEK CORPORATION,                   )  VOLUME 7
9                                    )
                     DEFENDANT       )  PAGES 886-1129
10                                   )

11

12                TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE PAUL S. GREWAL
13              UNITED STATES DISTRICT JUDGE

14  A P P E A R A N C E S:

15  FOR THE PLAINTIFF:     JEFFER MANGELS
                           BY:  GREGORY CORDREY
16                              STANLEY GIBSON
                           3 PARK PLAZA, STE 1100
17                         IRVINE, CA 92614

18  FOR THE DEFENDANT:     ADLI LAW GROUP
                           BY:  DARIUSH ADLI
19                              RASHEED MCWILLIAMS
                                PAYAM MORADIAN
20                         633 WEST FIFTH STREET, STE 6900
                           LOS ANGELES, CA 90071

21

22  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
    PRODUCED WITH COMPUTER.
23

24

25  OFFICIAL COURT REPORTER:     SUMMER FISHER, CSR, CRR
                                 CERTIFICATE NUMBER 13185

**A437**

1

2                        INDEX OF WITNESSES

3

4   DEFENDANT'S

5   **DR. HOMAYOON KAZEROONI**
            DIRECT EXAM BY MR. MORADIAN          P. 914
6           CROSS-EXAM BY MR. GIBSON            P. 950
            REDIRECT EXAM BY MR. ADLI           P. 1011
7           RECROSS-EXAM BY MR. GIBSON          P. 1024

8

9

10  REBUTTAL WITNESS FOR PLAINTIFF'S

11  **DR. RANDALL KING**
            DIRECT EXAM BY MR. CORDREY          P. 1037
12          CROSS-EXAM BY MR. MORADIAN          P. 1055
            REDIRECT EXAM BY MR. CORDREY        P. 1094
13          RECROSS EXAM BY MR. MORADIAN        P. 1102

14

15

16

17

18

19

20

21

22

23

24

25

**A438**

RECROSS-EXAM BY MR. GIBSON

1    TESTIMONY, SIR.

2         MR. ADLI?

3              MR. ADLI:  YOUR HONOR, WE DON'T HAVE ANY FURTHER

4    WITNESSES.

5              THE COURT:  OKAY.  WOULD YOU LIKE TO REST AT THIS

6    TIME, SIR.

7              MR. ADLI:  YES, YOUR HONOR.

8              THE COURT:  OKAY.

9         MR. GIBSON, WOULD YOU LIKE TO CALL ANY WITNESSES IN

10   REBUTTAL?

11             MR. GIBSON:  YES, WE WILL CALL DR. KING TO THE STAND

12   IN REBUTTAL AND MR. CORDREY WILL HANDLE THE EXAMINATION.

13             THE COURT:  ALL RIGHT.

14        DR. KING, WOULD YOU PLEASE RESUME YOUR PLACE ON THE WITNESS

15   STAND.

16        SIR, BECAUSE YOU STEPPED DOWN FORMALLY THE LAST TIME UP

17   HERE I DO NEED TO RE SWEAR YOU.

18        SO MR. RIVERA, WOULD YOU DO THE HONORS.

19

20                         **DR. RANDALL KING,**

21   BEING CALLED AS A WITNESS ON BEHALF OF THE

22   PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND

23   TESTIFIED AS FOLLOWS:

24             THE WITNESS:  I DO.

25             THE CLERK:  THANK YOU.  PLEASE BE SEATED.

**A439**

DIRECT EXAM BY MR. CORDREY

1    39.

2         I WILL WITHDRAW.

3              THE COURT:  YOU MAY CONTINUE.

4              MR. CORDREY:  OKAY.

5    Q.  I LOST MY PLACE A LITTLE BIT.  SO I APOLOGIZE IF I REPEAT

6    MYSELF.

7         I THINK THE LAST QUESTION I ASKED YOU WAS, WE WERE TALKING

8    ABOUT WHETHER THIS TWO-PIECE ARRANGEMENT, WHAT YOU FOUND IN

9    TERMS OF WHETHER IT DISTINGUISHED OVER THE PRIOR ART THAT TEK'S

10   EXPERT HAD IDENTIFIED.  WHAT DID YOU FIND?

11   A.  YES, IT DID DISTINGUISH OVER PRIOR ART.  THERE WAS NO PIECE

12   OF PRIOR ART THAT DISCLOSED A TWO-PIECE ARRANGEMENT.

13   Q.  AND DID YOU CONSIDER THIS TWO-PIECE ARRANGEMENT TO BE AN

14   INNOVATIVE FEATURE OF THE '581 PATENT?

15   A.  YES, I DID.

16   Q.  WHY IS THAT?

17              THE COURT:  GO AHEAD, MR. MCWILLIAMS.

18              MR. MCWILLIAMS:  I WILL RAISE THE SAME OBJECTION,

19   YOUR HONOR.

20        I HAVE NOW READ THE ENTIRE PAGE THERE'S NO DESCRIPTION OR

21   DISCUSSION OF A TWO-PIECE ARRANGEMENT OF ANYTHING.  HE TALKED

22   ABOUT A BOTTLE BEING USEABLE OR DISPOSABLE BUT HE'S NOT TALKING

23   ABOUT A TWO-PIECE CONSTRUCTION ON PAGE 39 OF HIS REBUTTAL

24   REPORT.

25              THE COURT:  MR. CORDREY?

**A440**

1    MR. CORDREY:  HE TALKS ABOUT THE -- ONE OF THE

2    ADVANTAGES OF THE '581 PATENT IS THAT IT ALLOWS THE CONTAINER

3    TO BE REMOVED AND REUSED EASILY.

4    MR. MCWILLIAMS:  YOU ARE TALKING ABOUT THE

5    CONSTRUCTION OF THE RECEPTACLE IN THE PORT, NOT THE CONTAINER.

6    MR. CORDREY:  THE RECEPTACLE IN THE REPORT IS THE

7    TWO-PIECE INSTRUCTION.

8    MR. MCWILLIAMS:  THAT'S IN THE ACCUSED PRODUCT NOT

9    THE '581 PATENT.

10    THE COURT:  OKAY.  IF I MIGHT HAVE A WORD HERE,

11    GENTLEMAN.

12    I WILL SUSTAIN THE OBJECTION, BUT MR. CORDREY YOU MAY

13    DIRECT THE WITNESS TO A PARTICULAR COMPONENT OR ELEMENT OF THE

14    CONTAINER THAT'S ADDRESSED ON PAGE 39.  LET'S KEEP MOVING.

15    MR. CORDREY:  OKAY.

16    Q.  DR. KING, SO FOLLOWING UP ON THE DISCUSSION, WHY WOULD

17    IT -- IS IT YOUR OPINION AS TO USING A TWO-PIECE CONSTRUCTION,

18    WOULD THAT BE OBVIOUS TO DO OVER A ONE PIECE CONSTRUCTION?

19    A.  NO, NO, IT WOULD NOT BE OBVIOUS.

20    Q.  WHY IS THAT?

21    A.  GENERALLY WHAT YOU DO WHEN YOU DESIGN SOMETHING IS ONE OF

22    YOUR GOALS IS THAT YOU WANT IT TO BE SIMPLE.  YOU DON'T WANT IT

23    TO BE COMPLICATED.  AND THERE'S VARIOUS REASONS FOR THAT.

24    OF COURSE ONE OF THE BIG REASONS IS COST.  TWO PIECES ARE

25    GENERALLY MORE EXPENSIVE THAN ONE PIECE.  IT'S MORE EXPENSIVE

**A441**

DIRECT EXAM BY MR. CORDREY

1    NOT THE MIXTURES.  SO THAT'S WHAT THIS QUESTION IS.

2            THE COURT:  SO DO YOU WANT TO WITHDRAW THE QUESTION

3    TO THE EXTENT IT ADDRESSED MIXTURE AND FOCUS ON THE OTHER

4    FACTORS.

5            MR. CORDREY:  SURE.  I WILL WITHDRAW THE QUESTION AND

6    REFRAME IT.

7    Q.  SO FOCUSSING ON FACTORS WE DISCUSSED HERE TODAY, DID YOU

8    CONSIDER ANY OF THOSE FACTORS TO BE FACTORS THAT SUPPORT YOUR

9    OPINION THAT THE '581 IS A PIONEERING PATENT?

10   A.  YES.

11   Q.  CAN YOU EXPLAIN?

12   A.  EXCUSE ME?

13           MR. MCWILLIAMS:  OBJECTION, YOUR HONOR.

14       HE NEVER USED THE WORD PIONEERING IN HIS EXPERT REPORT

15   ANYWHERE EITHER.  SO THE TESTIMONY IS OUTSIDE THE SCOPE OF THE

16   HIS EXPERT REPORT.

17           THE COURT:  MR. CORDREY, DO YOU WANT TO RESPOND.

18           MR. CORDREY:  I WILL REFRAME IT.

19   Q.  THE FACTORS WE ARE DISCUSSING HERE TODAY, DID YOU CONSIDER

20   ANY OF THE FACTORS WE'VE DISCUSSED HERE AS SUPPORTING YOUR

21   OPINION THAT THE '581 PATENT IS A FOUNDATIONAL PATENT?

22   A.  YES.

23   Q.  CAN YOU EXPLAIN THAT?

24   A.  THE, BASICALLY THE FEATURES THAT WE HAVE DISCUSSED HERE

25   THAT THE PATENT DESCRIBES A DEVICE HAVING A RECEPTACLE FORMED

**A442**

DIRECT EXAM BY MR. CORDREY

1    IN THE HOUSING AND A PORT THAT'S DISPOSED OR SEATED IN THE

2    RECEPTACLE SO THAT WE HAVE A TWO-PIECE ARRANGEMENT.

3        AND THIS PROVIDES A VERY EASY, CLEAN CONVENIENT WAY OF

4    DISPOSING OF THE -- OF THE BOTTLE OF SEALANT AND REPLACING IT

5    VERY EASILY AND CLEANLY WITH A NEW BOTTLE OF SEALANT.

6        AND I FEEL THAT THIS IS A FEATURE THAT MAKES THIS A

7    FOUNDATIONAL PATENT.

8            THE COURT:  MR. MCWILLIAMS.

9            MR. MCWILLIAMS:  SAME OBJECTION, YOUR HONOR.

10       DR. KING DID NOT DISCUSS FOUNDATIONAL IN EITHER OF HIS

11   REPORTS, FOUNDATIONAL AROSE IN THE CASE BECAUSE IT WAS CITED TO

12   BY MR. HANSEN IN HIS REPORT AND WHEN ASKED AT DEPOSITION

13   DR. KING DID NOT HAVE ANY OF THIS TYPE OF DETAILED TESTIMONY

14   THAT HE'S NOW OFFER NOTHING COURT.

15       SO HIS TESTIMONY TODAY IS OUTSIDE THE SCOPE OF HIS EXPERT

16   REPORT AND IT'S OUTSIDE THE SCOPE OF HIS PREVIOUS TESTIMONY AT

17   DEPOSITION.

18           THE COURT:  MR. CORDREY, YOUR RESPONSE?

19           MR. CORDREY:  IN HIS EXPERT REPORT HE ACTUALLY

20   INDICATED THAT IT WAS A -- THAT THE '581 PATENT REPRESENTED A

21   SIGNIFICANT ADVANCE IN THE ART OF PORTABLE TIRE REPAIR KITS.

22           MR. MCWILLIAMS:  THAT'S NOT FOUNDATIONAL OR

23   PIONEERING WHICH IS THE WORDS THEY HAVE BEEN HARPING ON FOR THE

24   LAST WEEK.

25           THE COURT:  ALL RIGHT.  I WILL SUSTAIN THE OBJECTION.

**A443**

1        I WILL ASK THE JURY TO DISREGARD THE TESTIMONY FROM THE

2    WITNESS REGARDING THE FOUNDATIONAL OR PIONEERING OR ANY OF THE

3    REASONS SUPPORTING EITHER OF THOSE CONCLUSIONS.

4        I WOULD INVITE MR. CORDREY, HOWEVER, TO TALK ABOUT THE

5    LANGUAGE THAT WAS USED IN THE REPORT.

6    BY MR. CORDREY:

7    Q.   DR. KING, LET ME TRY ONE MORE TIME.  FOCUSSING ON THE

8    FEATURES WE DISCUSSED HERE TODAY, DID YOU RELY ON ANY OF THESE

9    FEATURES AS MISSING IN THE PRIOR ART FOR YOUR OPINION THAT THE

10   '581 PATENT REPRESENTING A SIGNIFICANT ADVANCE IN THE ART OF

11   TIRE REPAIR KITS?

12   A.   YES.

13   Q.   CAN YOU EXPLAIN THAT?

14   A.   BASICALLY THE FEATURES THAT ARE DISCUSSED ON THE GRAPHIC

15   HERE.

16       THE '581 PATENT DESCRIBES A DEVICE HAVING A RECEPTACLE

17   FORMED IN THE HOUSING AND WHICH CAN HAVE A PORT THAT'S DISPOSED

18   OR SEATED IN THE RECEPTACLE GIVING A TWO-PIECE ARRANGEMENT

19   WHICH ALLOWS THE USER TO VERY EASILY AND CLEANLY AND

20   CONVENIENTLY DISPOSE OF THE BOTTLE OF SEALANT AND REPLACE IT

21   VERY EASILY AND CONVENIENTLY WITH A NEW BOTTLE OF SEALANT.

22   Q.   AND WHICH IS THE MOST, OF THESE FEATURES THAT YOU FOUND TO

23   BE THE MOST SIGNIFICANT, WHICH IS THE MOST SIGNIFICANT FEATURE?

24   A.   THE PORT DISPOSED IN THE RECEPTACLE OR THE PORT SEATED IN

25   THE RECEPTACLE, BASICALLY THE TWO-PIECE DESIGN.

**A444**

DIRECT EXAM BY MR. CORDREY

1    Q.   OKAY?

2              MR. MCWILLIAMS:  OBJECTION, YOUR HONOR.  SAME

3    OBJECTION.

4        HE DOES NOT MENTION A TWO-PIECE DESIGN OR THE TWO-PIECE

5    DESIGN BEING A SIGNIFICANT ADVANCEMENT IN HIS REPORT.

6        HE DOESN'T TALK ABOUT A TWO-PIECE DESIGN EXCEPT FOR EARLIER

7    ARE IN THE CLAIMS AND THAT'S FAR SEPARATED FROM THE PAGE THAT

8    DESCRIBES THE SIGNIFICANT ADVANCEMENTS OF WHAT HE CALLED THE

9    '581 PATENT.

10             THE COURT:  MR. CORDREY, DO YOU WANT TO RESPOND.

11             MR. CORDREY:  SURE.

12             MR. CORDREY:  IN HIS REPORT HE TALKS ABOUT THE FACT

13   THAT THE CONTAINER CAN BE EASILY REMOVED AND REATTACHED AS

14   BEING THE FEATURE THAT IS THE REASON WHY IT'S A SIGNIFICANCE

15   ADVANCE OR THE OTHER TIRE REPAIR KITS.

16             THE COURT:  DO YOU HAVE A PAGE WHERE YOU CAN DIRECT

17   ME?

18             MR. MCWILLIAMS:  THE CONTAINER BEING REMOVED ISN'T

19   THE TWO-PIECE HE'S DESCRIBING.

20       HE'S TALKING ABOUT THE PORT AND RECEPTACLE COMBINATION.  SO

21   WE ARE CLEAR FOR THE COURT.

22             THE COURT:  GO AHEAD, MR. CORDREY.

23             MR. CORDREY:  THAT'S AT PAGE 26, YOUR HONOR.  IT'S IN

24   HIS --

25             THE COURT:  ALL RIGHT.

**A445**

1052

1      I'M GOING TO SUSTAIN THE OBJECTION AND ASK THE LAST

2  ANSWER BE DISREGARD.

3      MR. CORDREY, YOU MAY CONTINUE.

4          MR. CORDREY:  YES, YOUR HONOR.

5  Q.  LET'S TURN TO THE SUBJECT OF OBVIOUSNESS.

6      WHAT WAS YOUR OPINION REGARDING WHETHER ANY OF THE CLAIMS

7  OF THE '581 PATENT ARE OBVIOUS OVER THE PRIOR ART IDENTIFIED BY

8  TEK CORPORATION'S EXPERT?

9  A.  MY OPINION IS THAT NONE OF THE CLAIMS OF THE '581 PATENT

10  ARE OBVIOUS IN VIEW OF ANY OF THE PIECES OF PRIOR ART OR ANY OF

11  THE COMBINATIONS OF PIECES OF PRIOR ART.

12  Q.  WHY DO YOU SAY THAT?

13  A.  BECAUSE THERE'S NO PIECE OF PRIOR ART AND THERE'S NO

14  COMBINATION OF ANY OF THE PIECES OF PRIOR ART THAT DISCLOSE

15  EVERY ELEMENT OF ANY ONE OF THE CLAIMS OF THE PATENT.

16  Q.  WHEN YOU ANALYZE THE PRIOR ART, WHAT DID YOU CONSIDER IN

17  ANALYZING THE PRIOR ART IN LOOKING AT THE OBVIOUSNESS INQUIRY?

18  A.  WELL, AGAIN, I LOOKED AT THE -- I LOOKED AT THE PRIOR ART.

19  I LOOKED AT THE ARGUMENTS THAT HELP ADVANCED FOR THE PRIOR ART.

20  AND I ALSO LOOKED AT, AT TWO MORE FACTORS.

21      ONE OF THEM WAS THE FACT THAT THE PATENT HAS BEEN

22  SUCCESSFUL, COMMERCIALLY.

23  Q.  CAN YOU EXPLAIN WHAT --

24          MR. MCWILLIAMS:  OBJECTION, YOUR HONOR.

25      HE NEVER TESTIFIED ABOUT THE PATENT BEING COMMERCIALLY

**A446**

1

2

3

4                    **CERTIFICATE OF REPORTER**

5

6

7

8              I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13             THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23

24   _____

25   SUMMER A. FISHER, CSR, CRR
     CERTIFICATE NUMBER 13185          DATED: 4/23/13

**A447**

# United States Court of Appeals
## for the Federal Circuit

*Sealant Systems International v. TEK Global, S.R.L.*, 2014-1405, -1428

### CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by KEKER & VAN NEST LLP, Attorneys for Defendants-Appellants to print this document.  I am an employee of Counsel Press.

On **November 3, 2014**, Counsel for Appellant has authorized me to electronically file the foregoing **DEFENDANTS-APPELLANTS' REPLY IN SUPPORT OF EXPEDITED MOTION TO STAY PERMANENT INJUNCTION (confidential and non-confidential version)** with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Stanley M. Gibson (Principal Counsel)
> Gregory S. Cordrey
> Andrew I. Shadoff
> Jeffer, Mangels, Butler & Marmaro, LLP
> 1900 Avenue of the Stars, 7th Floor
> Los Angeles, CA  90067
> 310-203-8080
> sgibson@jmbm.com
> gcordrey@jmbm.com
> ais@jmbm.com

Additionally, copies of the Confidential Motion has been emailed and mailed to the above counsel on this date.

November 3, 2014                    /s/ Robyn Cocho
                                       Counsel Press